UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                              Chapter 11

CARGO TRANSPORTATION                              Case No. 8:11-bk-00432-MGW
SERVICES, INC.,

     Debtor.

_____/

## AMENDED DISCLOSURE STATEMENT IN CONNECTION WITH
## PLAN OF REORGANIZATION OF CARGO TRANSPORTATION SERVICES, INC.

David S. Jennis
Florida Bar No. 775940
Kathleen L. DiSanto
Florida Bar No. 0058512
**Jennis & Bowen, P.L.**
400 N. Ashley Dr., Ste. 2540
Tampa, FL 33602
Telephone: (813) 229-1700
Facsimile: (813) 229-1707
Email: djennis@jennisbowen.com
Counsel to the Debtor and Debtor-in-Possession

Dated: August 12, 2011

THIS AMENDED DISCLOSURE STATEMENT HAS NOT BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. THE HEARING TO CONSIDER THE ADEQUACY OF THIS AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND CONFIRMATION OF THE AMENDED PLAN OF REORGANIZATION PURSUANT TO SECTION 1129 OF THE BANKRUPTCY CODE **IS CURRENTLY SCHEDULED FOR SEPTEMBER 14, 2011 AT 1:30 P.M. EASTERN TIME.** THE DEBTOR RESERVES THE RIGHT TO MODIFY AND SUPPLEMENT THIS AMENDED DISCLOSURE STATEMENT AND THE ACCOMPANYING AMENDED PLAN OF REORGANIZATION UP TO AND INCLUDING THE TIME OF CONFIRMATION OF THE AMENDED PLAN OF REORGANIZATION. THE DEBTOR IS NOT CURRENTLY SOLICITING VOTES ON THE AMENDED PLAN OF REORGANIZATION.

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS AMENDED DISCLOSURE STATEMENT IS PROVIDED FOR PURPOSES OF SOLICITING VOTES ON THE *AMENDED PLAN OF REORGANIZATION OF CARGO TRANSPORTATION SERVICES, INC.* (THE "PLAN"). THE INFORMATION MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS AMENDED DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF VOTES ON THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS AMENDED DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS AMENDED DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS AMENDED DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE STATED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS AMENDED DISCLOSURE STATEMENT WILL BE CORRECT AT ANY TIME AFTERWARDS.

THIS AMENDED DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS AGAINST CARGO TRANSPORTATION SERVICES, INC., OR DEBTOR-IN-POSSESSION IN THIS CASE, SHOULD EVALUATE THIS AMENDED DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS AMENDED DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. THIS AMENDED DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN CARGO TRANSPORTATION SERVICES, INC. OR DEBTOR-IN-POSSESSION IN THIS CASE.

# TABLE OF CONTENTS

I.      **PRELIMINARY STATEMENT** ................................................................ 1
II.      **PURPOSE OF THE DISCLOSURE STATEMENT** ........................... 1
III.      **THE CHAPTER 11 PROCESS** ...................................................... 3
     A.    **Explanation of the Reorganization Process.** ................................. 3
     B.    **Approval of Disclosure Statement.** ............................................. 3
     C.    **Voting Procedures.** ..................................................................... 3
     D.    **Confirmation.** ............................................................................. 4
     E.    **Procedure for Filing Proofs of Claim and Proofs of Interest.** ....... 5
IV.      **INFORMATION REGARDING THE DEBTOR** .............................. 6
     A.    **Overview and History of the Debtor** ........................................... 6
     B.    **Management and Ownership of the Debtor** ................................. 7
     C.    **Debt Structure.** ......................................................................... 8
     D.    **Reasons for Filing Chapter 11.** ................................................... 8
     E.    **Significant Events in the Reorganization Case.** .......................... 9
     F.    **Authorization to Use Cash Collateral** ..................................... 10
     G.    **DIP Financing** .......................................................................... 11
     H.    **Critical Vendor/Independent Contractor Relations** ................... 11
     I.    **CLAIMS AGAINST COMERICA AND BBK** ........................... 14
V.      **SUMMARY AND ANALYSIS OF CLAIMS** ................................ 14
     B.    **Other Secured Claims Summary Chart** ................................... 14
VI.      **HISTORICAL FINANCIAL PERFORMANCE AND FINANCIAL PROJECTIONS** ........................................................................ 16
VII.      **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN** .................................................................. 17
VIII.      **CLAIMS ALLOWANCE AND PAYMENT, EXECUTORY CONTRACTS, REVESTING OF ASSETS** ........................................................ 29
     A.    **Allowed Claims, Distribution Rights, and Objections to Claims.** ...... 29
     B.    **Disposition of Executory Contracts and Unexpired Leases** ............... 33
     C.    **Revesting of Assets; Release of Liens** ..................................... 34
IX.      **POST-CONSUMMATION CORPORATE STRUCTURE, MANAGEMENT, AND OPERATION, DISCHARGE INJUNCTIONS** ........ 35
     A.    **Continued Corporate Existence** ................................................ 35
     B.    **Post-Consummation Governance Documents** ............................ 35
     C.    **Officers and Directors of Reorganized Debtor** ......................... 35
     D.    **Corporate Action** ...................................................................... 35
     E.    **Necessity of Releases** ............................................................... 38
X.      **PREFERENCES, FRAUDULENT CONVEYANCES, AND OTHER CAUSES OF ACTIONS** ........................................................... 39
XI.      **RISK FACTORS TO BE CONSIDERED** .................................... 41
     A.    **General Bankruptcy Risk Factors** ............................................ 41
     B.    **Uncertainty of Financial Projections** ...................................... 42
     C.    **Operational Risk Factors** ........................................................ 43
XII.      **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ... 43
     A.    **General** .................................................................................... 43

| | | | |
|---|---|---|---|
| | B. | **Certain U.S. Federal Income Tax Consequences of the Plan to CTS.**................ | **43** |
| | C. | **Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests**................................................................. | **44** |
| | D. | **Backup Withholding and Reporting**................................................ | **47** |
| | E. | **IRS Circular 230 Notice**.............................................................. | **47** |
| **XIII.** | | **FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS**.. | 47 |
| | A. | **Feasibility of the Plan**................................................................ | **47** |
| | B. | **Liquidation Analysis**................................................................ | **47** |
| **XIV.** | | **SUMMARY, RECOMMENDATION, AND CONCLUSION**.......................... | 49 |

# I. PRELIMINARY STATEMENT

This *Amended Disclosure Statement in Connection with Amended Plan of Reorganization of Cargo Transportation Services, Inc.* (the "Disclosure Statement") is submitted by Cargo Transportation Services, Inc. ("CTS" or "Debtor") pursuant to Section 1125 of the Bankruptcy Code in connection with the *Amended Plan of Reorganization of Cargo Transportation Services, Inc.*, dated as of August 12, 2011 (the "Plan"), proposed by the Debtor in its efforts to reorganize under Chapter 11 of the Bankruptcy Code. A copy of the Plan is attached as **Exhibit "A."** For purposes hereof, all capitalized terms used in this Disclosure Statement, and not otherwise separately defined herein, shall have the same meanings as such terms have in the Plan. Such meanings shall be equally applicable to both the singular and plural forms of such terms.

# II. PURPOSE OF THE DISCLOSURE STATEMENT

This Disclosure Statement sets forth certain information regarding the Debtor's (a) pre-petition and post-petition operating and financial history, (b) its reasons for seeking protection and reorganization under Chapter 11, (c) significant events that have occurred and steps taken during the Chapter 11 case to facilitate the Debtor's reorganization, (d) the projections reflecting the Debtor's anticipated operations and financing upon its successful emergence from Chapter 11 to show how the Plan may be consummated, (e) a "liquidation analysis" demonstrating the recoveries if the Debtor were liquidated rather than reorganized, (f) various possible Federal tax consequences, and (g) estimates of the total administrative costs and expenses that may be incurred in connection with the Chapter 11 case. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and procedures for resolutions of Claims against the Debtor and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

By Order dated _____, 2011, the Bankruptcy Court has conditionally approved this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical reasonable investor typical of the Holders of Claims and Interests in the Classes entitled to vote pursuant to the Plan to make an informed judgment whether to accept or reject the Plan. **CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

**NO STATEMENT OR INFORMATION CONCERNING THE DEBTOR (PARTICULARLY AS TO FUTURE BUSINESS, RESULTS OF OPERATIONS OR FINANCIAL CONDITION, OR WITH RESPECT TO DISTRIBUTIONS TO BE MADE UNDER THE PLAN) OR ANY OF ITS ASSETS, PROPERTY, OR BUSINESS THAT IS GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN IS AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE STATEMENTS AND THE FINANCIAL INFORMATION OF THE DEBTOR, INCLUDING ALL FINANCIAL PROJECTIONS AND INFORMATION REGARDING CLAIMS OR INTERESTS CONTAINED HEREIN, HAVE BEEN**

PREPARED FROM DOCUMENTS AND INFORMATION PREPARED BY THE DEBTOR OR PROVIDED TO THE DEBTOR'S PROFESSIONALS BY THE DEBTOR. THE DEBTOR HAS NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY OR COMPLETENESS OF SUCH STATEMENTS AND INFORMATION AND EXPRESSLY DISCLAIMS ANY REPRESENTATION CONCERNING THE ACCURACY OR COMPLETENESS THEREOF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN INFERENCE THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED EVIDENCE OF THE TAX OR OTHER LEGAL CONSEQUENCES OR EFFECTS OF THE REORGANIZATION OF THE DEBTOR. CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BY ITS NATURE, IS A FORECAST OF FUTURE EVENTS AND, THEREFORE, INCLUDES ESTIMATES, ASSUMPTIONS, AND PROJECTIONS WHICH MAY PROVE TO BE WRONG, OR WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT SUCH HOLDER'S ATTORNEY AND ACCOUNTANT AS TO THE EFFECT OF THE PLAN ON SUCH HOLDER INCLUDING, BUT NOT LIMITED TO, THE TAX EFFECTS OF THE PLAN.

IT IS OF THE UTMOST IMPORTANCE TO THE DEBTOR THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN BY COMPLETING AND SIGNING THE BALLOT ENCLOSED HEREWITH AND FILING IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, 801 NORTH FLORIDA AVENUE, TAMPA, FLORIDA 33602, <u>ON OR BEFORE 4:00 P.M. EASTERN TIME ON _____, 2011.</u>

THE DEBTOR BELIEVES THAT IT IS IN THE BEST INTERESTS OF ALL PARTIES TO VOTE TO ACCEPT THE PLAN BECAUSE THE PLAN FAIRLY AND EQUITABLY TREATS ALL HOLDERS OF CLAIMS BY PROVIDING THE EARLIEST POSSIBLE AND MAXIMUM RECOVERY TO SUCH HOLDERS.

# III.    THE CHAPTER 11 PROCESS

## A.    Explanation of the Reorganization Process.

Chapter 11 of the Bankruptcy Code contemplates the formulation of a plan of reorganization and outlines how a debtor's debts will be paid.  Unlike cases under Chapter 7, 12, or 13 of the Bankruptcy Code, a trustee is not ordinarily appointed in a Chapter 11 case.  Instead, the debtor remains in control of its assets and business affairs as a "debtor-in-possession" with most of the powers and duties of a trustee.  In addition to statutory requirements relating to plan formulation, confirmation, and post-confirmation matters, a Chapter 11 case is also shaped by statutory prohibitions against collection efforts or enforcement actions by creditors in order to allow the debtor breathing space within which to reorganize.  The Bankruptcy Code contains a number of other significant provisions applicable to Chapter 11 cases, such as those relating to post-petition financing and pre-petition executory contracts, which confer powers on the debtor-in-possession and also provides creditors with certain rights and remedies.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case.  A plan of reorganization sets forth the means by which claims against, and interests in, the debtor will be satisfied.  After a plan of reorganization has been filed, it must be accepted by holders of claims against, or interests in, the debtor.  Section 1125 of the Bankruptcy Code requires full disclosure before solicitation of acceptances of a plan of reorganization.  This Disclosure Statement is presented to Holders of Claims and Interests to satisfy the disclosure requirements of Section 1125 of the Bankruptcy Code.

## B.    Approval of Disclosure Statement.

On _____, 2011, the Bankruptcy Court entered its *Order Conditionally Approving Disclosure Statement, Fixing Time to File Objections to the Disclosure Statement, Fixing Time to File Applications for Administrative Expenses, Setting Hearing on Confirmation of the Plan, and Setting Deadlines with Respect to Confirmation Hearing*  (Doc. No. ___) (the "Disclosure Statement Order").  Pursuant to the Disclosure Statement Order, the Bankruptcy Court has conditionally approved the Disclosure Statement as containing "adequate information" (i.e., information of a kind and in sufficient detail to enable a hypothetical reasonable creditor typical of the Holders of Claims and Interests to make an informed judgment whether to accept the Plan).  However, this conditional approval is subject to objections to this Disclosure Statement (if any) which will be considered by the Bankruptcy Court together with confirmation of the Plan, at a combined hearing on **September 14, 2011, at 1:30 p.m. Eastern Time.**

## C.    Voting Procedures.

(1)    <u>Persons Entitled to Vote</u>.  Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are Impaired under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan.  Furthermore, if a Class of Claims or Interests is not entitled to receive any Distribution under the Plan, such Class is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Holders of Disputed Claims are not entitled to vote on the Plan unless the Bankruptcy Court, upon motion of such

Holder, temporarily allows the Claim in the Estimated Claim Amount defined by the Court for purposes of voting to accept or reject the Plan.

(2) <u>Voting Instructions</u>.

(i) **Ballots**. In voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement. If you have Claims or Interests in more than one Class, you may receive multiple ballots. **IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM OR INTEREST AND YOU SHOULD COMPLETE AND RETURN ALL BALLOTS.**

(ii) **Returning Ballots**. **YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND FILE IT WITH THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, 801 NORTH FLORIDA AVENUE, TAMPA, FLORIDA 33602, <u>ON OR BEFORE 4:00 P.M., EASTERN TIME ON _____, 2011</u>. IN ORDER TO BE COUNTED, BALLOTS MUST BE FILED WITH THE BANKRUPTCY COURT ON OR BEFORE THAT TIME.**

**Incomplete or Irregular Ballots**. Ballots which fail to designate the Class to which they apply shall be counted, subject only to contrary determinations by the Bankruptcy Court, in the Class determined by the Debtor. **BALLOTS THAT ARE NOT SIGNED AND BALLOTS THAT ARE SIGNED BUT NOT EXPRESSLY VOTED EITHER FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

**D.** **<u>Confirmation</u>**.

(1) <u>Confirmation Requirements</u>. For a Debtor's Plan to be confirmed, Chapter 11 requires that a requisite number of votes be cast in favor of the Plan. However, Chapter 11 does not require that every Holder of a Claim or Interest vote in favor of the Plan for it to be confirmed by the Bankruptcy Court. For any Class of Impaired Claims to accept the Plan, Section 1126(c) of the Bankruptcy Code requires that claimants who hold a majority in number and at least two-thirds (2/3) in the amount of the Allowed Claims in such Class that actually vote on the Plan must vote to accept the Plan. For a Class of Impaired Interests to accept the Plan, Section 1126(d) of the Bankruptcy Code requires that Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that actually vote on the Plan must vote to accept the Plan.

Even if all Classes of Claims and Interests accept the Plan, Section 1129 of the Bankruptcy Code requires that the Bankruptcy Court find, among other things, that the Plan is in the best interests of Holders of Claims and Interests. Section 1129 generally requires that the value to be distributed to Holders of Claims and Interests may not be less than such parties would receive if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code.

(2) <u>Cramdown</u>. Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though less than all of the Classes of Claims and Interests accept it. Confirmation of the Plan over the objection of one or more Impaired Classes

of Claims or Interests is generally referred to as a "cramdown." For the Plan to be confirmed over the objection of an Impaired Class of Claims or Interests, the Debtor must show that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan.

(3)    <u>Confirmation Hearing</u>.  The Bankruptcy Court has not yet set a Confirmation Hearing with respect to the Plan.  Each party in interest will receive, either with this Disclosure Statement or separately, the Bankruptcy Court's notice of the hearing on Confirmation of the Plan.  The Confirmation Hearing may be adjourned, from time to time, by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

(4)    <u>Feasibility of the Plan</u>.  The terms proposed by the Debtor for the treatment of Allowed Claims and Allowed Interests under the Plan are based upon, among other things, the assessment by the Debtor of the relative priority afforded to various Claims and Interests under the Bankruptcy Code and the Debtor's ability to repay each of the obligations consistent with the capital requirements of Reorganized Debtor's business.  **WHILE THERE CAN BE NO ASSURANCE THAT THE PLAN, IF CONFIRMED, WILL BE SUCCESSFUL, THE DEBTOR BELIEVES THAT REORGANIZATION UNDER THE PLAN DOES PROVIDE FOR THE GREATEST AND EARLIEST RECOVERIES FOR ALL HOLDERS OF CLAIMS AND INTERESTS.**

(5)    <u>Effect of Confirmation</u>.  Confirmation makes the Plan binding upon the Debtor, all Holders of Claims and Interests and other parties in interest, regardless of whether or not it has been accepted by them.

**E.    Procedure for Filing Proofs of Claim and Proofs of Interest**.

(1)    <u>Bar Dates</u>.

(i)    **General Bar Date for Claims**.  All Proofs of Claim must have been filed by the close of business on March 28, 2011 (the "<u>General Claims Bar Date</u>").  **IF A CLAIM WAS LISTED IN THE SCHEDULES FILED BY THE DEBTOR AND NOT DESIGNATED AS CONTINGENT, UNLIQUIDATED, OR DISPUTED, A PROOF OF CLAIM NEED NOT HAVE BEEN FILED.  THE DEBTOR'S LISTING OF ANY CLAIM IN THE SCHEDULES THAT WAS NOT DESIGNATED AS CONTINGENT, UNLIQUIDATED, OR DISPUTED WILL NOT PRECLUDE THE DEBTOR OR ANY PARTY-IN-INTEREST FROM OBJECTING AND/OR SEEKING DISALLOWANCE OF SUCH CLAIM ON ANY GROUNDS INCLUDING, WITHOUT LIMITATION, PAYMENT OF SUCH CLAIM DURING THE BANKRUPTCY CASE.**  Both the Schedules and the registers listing Proofs of Claim that were filed on or before the General Claims Bar Date are on file at the Bankruptcy Court and are open for inspection during regular Bankruptcy Court hours.

(ii)    **Administrative Claims Bar Date**.  Unless otherwise ordered by separate order of the Bankruptcy Court, the Disclosure Statement Order will establish a bar date or deadline for the filing of all Applications for Allowance ("<u>Administrative Claims Bar Date</u>").

Administrative Expense Claims arising after the Administrative Claims Bar Date shall be filed within thirty (30) days of the date of entry of an order confirming the Plan (the "Confirmation Order").

              (iii)    **Administrative Expense Claims**.  Unless otherwise ordered by the Bankruptcy Court, the notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2002(f) and 3020(c) will set forth such date and constitute notice of the Administrative Claims Bar Date.  The Reorganized Debtor and any other party in interest will have approximately thirty (30) days after the Administrative Claims Bar Date to review and object to such Administrative Expense Claims before a hearing for determination of such Claims is held by the Bankruptcy Court.

              (2)    Executory Contracts and Unexpired Leases.  Unless otherwise ordered by separate order of the Bankruptcy Court, parties to executory contracts or unexpired leases that are rejected by the Debtor under the Plan must file any Claims for damages resulting from such rejection within thirty (30) calendar days after the Confirmation Date.  Parties to executory contracts or unexpired leases that were or may be rejected by the Debtor by motion or otherwise before Confirmation must file Proofs of Claim for any rejection damages in accordance with the Bankruptcy Court's Order with respect to such rejection.

              (3)    Request for Payment.  Any Claim or request for payment of an Administrative Expense Claim that is not filed by the applicable deadline set forth above will be barred and any Person or Entity that fails to file a Proof of Claim or request for payment of an Administrative Expense by the applicable deadline will be forever barred from asserting such Claim against the Debtor, the Reorganized Debtor, and/or its Property, and the Holder thereof will be enjoined from commencing or continuing any action, proceeding, employment of process, or act to collect, offset, or recover such Claim or Administrative Expense Claim.

## IV.    INFORMATION REGARDING THE DEBTOR

**A.**    **Overview and History of the Debtor**.

The Debtor is a Florida corporation that has provided comprehensive transportation services to clients nationwide, including customized consolidation, distribution, logistics, and warehousing services for over ten years.  CTS has the capabilities to provide its Customers with a variety of services, including refrigerated trailer, LTL ("less than truckload") carrier management, Hot Shot/Expedited services, airport to airport truck services, flatbed trailers, logistic bar trailers, containers, trans-loading, satellite equipment tracking, cross border services, bonded services, customs broker services, bilingual customer service, and electronic data interchange capabilities.

In both 2008 and 2009, CTS was recognized by INC Magazine as one of the fastest growing transportation companies in America.  Since 2003, CTS has experienced a 440% growth in annual gross revenues, with annual gross revenue increasing to $95,000,000.00.  CTS employs over 140 people and has Customers in numerous industries, including consumer goods, printed material, produce and perishable goods, building materials, medical supplies, aviation and

aerospace equipment and parts, food and beverage, cruise lines, cosmetics, and United States Military supplies and equipment.

CTS is one of the leading providers of LTR ("load to ride") services, a highly profitable segment of the LTL market. LTR services require planning and coordination that very few of CTS' competitors can provide.

LTL carrier management has been a growing portion of the Debtor's business since 2008. In 2009, CTS invested in cutting-edge software (referred to as "Better Utilization and Distribution through E-Commerce" or "BUD-E" by the Debtor) which automates the entire LTL process by providing Customers with online access to the BUD-E system. Through the BUD-E system, Customers can view all LTL carrier rates and services and select the LTL carrier best suited to meet the Customer's needs. Profit margins are fairly high with respect to this sector of the Debtor's business, as it consumes fewer employee resources due to the limited human interaction by virtue of the BUD-E System. Reaching a CV/IC Agreement with a major LTL carrier will facilitate the Debtor in increasing its sales volume with respect to this segment of its business.

## B.  Management and Ownership of the Debtor

(1)  Officers of the Debtor.  The following individuals currently serve as officers of the Debtor:

**John Manning** – Mr. Manning founded CTS in 2000, along with his son-in-law, David Bell.  Mr. Manning presently serves as the Chairman of the Board of Directors and Chief Executive Officer, as he has since the company's inception.  His responsibilities include overseeing global business operations.

**David Bell** – Mr. Bell is the co-founder of CTS and has served as the President and Chief Operating Officer since the company's inception.  His responsibilities include supervising management and daily business operations, in addition to interfacing with the multiple bankruptcy professionals on a daily basis to ensure progression of this bankruptcy case.

**David Knutson** – For the past seven months, Mr. Knutson has served as the Vice President of Finance.  He oversees accounts payable, accounts receivable, collections, and financial reporting/analysis functions.

**Jeff Maser** – Mr. Maser has served as the Executive Vice President for seven years.  In addition to assisting the Chief Operating Officer, Mr. Maser recruits sales representatives, in addition to other key personnel, and assists with the expansion of CTS' nationwide business operations.

**William "Bill" Nichols** – For over four years, Mr. Nichols has served as the Executive Vice President of Sales.  His primary responsibilities include managing and

maintaining significant Customer accounts and managing and directing the Debtor's sales force.

              **Scott Rohleder** - Mr. Rohleder joined CTS six months ago as the Vice President of Operations.  He oversees the general managers at the Debtor's locations in Tennessee, California, and Florida and the Debtor's operational units, which include, among other things, warehouses and facilities for picking up and consolidating freight.

              (2)    <u>Shareholders of the Debtor</u>.  Ann Manning and Stacey Bell, the wives of Mr. Manning and Mr. Bell, hold a forty-nine percent (49%) Equity Interest in the Debtor and a fifty-one percent (51%) Equity Interest in the Debtor, respectively.

              (3)    <u>Board of Directors</u>.  The Board of Directors (the "<u>Board</u>") was formed in late 2010.  Mr. Manning serves as the Chairman.  In addition to Mr. Manning, the current members include Lieutenant Colonel David Browning and Jerry Griffin, who each have respectively fifty years of experience in the transportation industry.  Charles "Chuck" Rosen formerly served on the Board of Directors but resigned his seat upon taking a general manager position with CTS to avoid the perception of a conflict of interest.

## C.    <u>Debt Structure</u>.

        Pursuant to the terms of a Master Revolving Note dated May 17, 2010, the Debtor had a $10,150,000.00 line of credit with Comerica, secured by the Debtor's accounts receivable, inventory, equipment, and fixtures.  The Debtor's ability to draw on the line of credit was dictated by an Advance Formula Agreement.  The Advance Formula Agreement provided that CTS' indebtedness to Comerica was not to exceed the Applicable Percentage, which is defined in the Comerica Loan Documents as eighty-five percent (85%) less a "Dilution Reserve" of eligible accounts receivable.  As of the Petition Date, the Debtor owed Comerica approximately $6,532,919.91 (inclusive of an undrawn $50,000 letter of credit).

## D.    <u>Reasons for Filing Chapter 11</u>.

        Several factors precipitated the Debtor's need for relief under Chapter 11 of the Bankruptcy Code, but primarily Comerica's seizure of approximately $1,700,000.00 from the Debtor's bank accounts and accounts receivable led to the Debtor's filing under Chapter 11 of the Bankruptcy Code.  The Debtor believed that Chapter 11 relief was necessary in order to reorganize its business and financial affairs on terms satisfactory to Comerica and other Creditors.  Further, as explained below, the Debtor's management determined that bankruptcy protection was necessary to preserve the going concern value of the Debtor's business for the benefit of all of its Creditors.

        On January 10, 2011, Comerica relied on technical non-monetary defaults to unilaterally seize the Debtor's funds in its bank accounts and collect the Debtor's accounts receivable.  Comerica's actions had a catastrophic effect on the Debtor's business, as the Debtor no longer had sufficient operating cash to pay its expenses as they came due, particularly the obligations owed to certain critical vendors and independent contractors, which are the lifeblood of the company as their services are essential to CTS' business operations.  Faced with the seizure of its

funds and inability to pay its operating expenses, employees, vendors, and satisfy obligations to Customers, the Debtor was forced to seek relief under Chapter 11 on January 12, 2011.

## E.     <u>Significant Events in the Reorganization Case</u>.

On the Petition Date, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has operated its business and managed its assets as Debtor-in-Possession under Sections 1107 and 1108 of the Bankruptcy Code.  To ensure the continuation of normal business operations and preserve the value of the business, the Bankruptcy Court authorized the Debtor to continue its business activities.

The Debtor filed several papers with the Bankruptcy Court seeking relief through what are often termed "first day motions."  First day motions are generally intended to ease and facilitate the transition between a debtor's pre-petition and post-petition business operations. These motions are essentially designed to allow certain normal business practices and provide for smoother administration of the Bankruptcy Case but require the prior approval of the Bankruptcy Court.  The first day motions filed and orders obtained in the Chapter 11 Case were typical of orders entered in business reorganization cases in this jurisdiction, and requested and authorized, among other things:

- the use of property that may be "Cash Collateral";

- authority to obtain Debtor-in-Possession financing ultimately through a revolving line of credit with Comerica ("<u>DIP Loan</u>");

- the employment of general bankruptcy counsel;[1]

- the resolution of various utility deposit issues;

- authority to pay its approximately 140 employees;

- authority to pay certain Critical Vendors; and

- authority to establish payment procedures for certain professionals.

In addition to the foregoing, several events have occurred since the commencement of this case that the Debtor believes will have a significant positive impact on its reorganization efforts, including (i) the retention of Eric Danner and CRG Partners Group, LLC as Financial Advisor, (ii) final authorization to use Cash Collateral and approval of an amended budget, (iii) the pay-off of the DIP credit line provided by Comerica, and (iv) approval by the Bankruptcy Court of settlement agreements with Estes and Old Dominion, national preferred LTL carriers.

---

[1] On May 3, 2011, the Bankruptcy Court entered an order substituting Jennis & Bowen, P.L. for Stichter, Riedel, Blain & Prosser, P.A. as counsel for the Debtor.  (Doc. No. 331.)

## F.     Authorization to Use Cash Collateral

A significant portion of time, effort, resources, and court hearings during the early phase of this case were devoted to the procedural and substitute disputes between the Debtor and Comerica regarding the Debtor's use of Cash Collateral. As one of the first day motions, CTS sought authority to use property that is considered "Cash Collateral" under Section 363(a) of the Bankruptcy Code. The Debtor's use of Cash Collateral was consistently opposed by Comerica, and the Court conducted six (6) interim Cash Collateral hearings and subsequently entered a Final Cash Collateral Order authorizing the use of Cash Collateral on April 8, 2011. (Doc. No. 273.) The focus on Cash Collateral has eclipsed many other aspects of the Debtor's reorganization and has consumed substantial resources and time, and resulted in significant administrative costs.

As a result of the commencement of the case, the pre-existing lending relationship with Comerica under the credit facility established under the Comerica Loan was suspended and replaced with the terms of the Interim Cash Collateral Orders, and ultimately the Final Cash Collateral Order. The Final Cash Collateral Order provides for (a) the use of Cash Collateral with adequate protection based on the existence of an "equity cushion." Currently, that equity cushion is maintained through the use of a budget that generally contemplates the use of amounts of Cash Collateral up to eighty-five (85%) of the Debtor's gross billed accounts receivable, plus eighty-five percent (85%) of the Debtor's gross unbilled accounts receivable, plus one hundred percent (100%) of the Debtor's available Cash balances in any bank account minus the pre-petition indebtedness owed to Comerica, (b) daily and weekly reporting to Comerica, and (c) a replacement lien in favor of Comerica to the same extent, amount, validity, priority, and dignity as Comerica's pre-petition lien as adequate protection for the use of Cash Collateral. The Bankruptcy Court has not determined what amount of "equity cushion" may be necessary or appropriate to provide sufficient adequate protection.

In accordance with the Final Cash Collateral Order, on April 15, 2011, the Debtor filed the *Debtor's Emergency Motion for Entry of an Order Approving New 13-Week Budget* (Doc. No. 297), and the Court approved the new budget at a hearing on April 19, 2011. On July 3, 2011, the Debtor filed the *Debtor's Second Motion for Entry of an Order Approving New 13-Week Budget* (Doc. No. 524), and again the Court approved the budget at a hearing on July 6, 2011.

Comerica recently filed a motion seeking additional adequate protection with respect to the Debtor's use of cash collateral. The calculation of the cash collateral base and the inclusion of work-in-progress ("WIP") was the primary focus of Comerica's motion. With respect to the calculation of the cash collateral base and equity cushion, the reporting provided by the Debtor to Comerica is consistent with this Court's prior orders. While the equity cushion may not be as extensive as it was on the petition date, the Debtor believes the equity cushion is substantially higher than the $517,398 stated by Comerica (and likely closer to $1,000,000), as the figure provided by Comerica reflects a 15% discount with respect to WIP and accounts receivable. The convertible nature of the WIP to accounts receivable and accuracy of the Debtor's WIP reporting is verifiable, and supports the Court's conclusion based on prior testimony that WIP becomes collectible accounts receivable. Over the last sixty (60) days, over 90% of the loads and over

100% of the load dollars included on its WIP report have become accounts receivable. Comerica's motion remains pending before the Bankruptcy Court, but the Debtor believes the Amended Plan and this Disclosure Statement will potentially lead to global resolution with Comerica.

## G. DIP Financing

From the commencement of the case, the Debtor anticipated that it would need DIP Financing to meet its post-petition operating expenses, largely because of Comerica's seizure of accounts receivable and Cash, which catastrophically disrupted the cash flow serving as the Debtor's operating capital. CTS initially sought to obtain DIP Financing from Advance Business Capital LLC, but ultimately obtained DIP Financing from Comerica. (Doc. Nos. 23, 61, and 274.) Under the terms of the DIP Loan, the Debtor could borrow up to $3,000,000.00 on substantially the same terms as provided in the Comerica Loan Documents. The DIP Financing from Comerica proved to be problematic for the Debtor, due, in part, to the limitations imposed by the borrowing base formula proscribed by the Comerica Loan Documents and onerous reporting and funds clearance requirements, which resulted in further constriction of the Debtor's cash flow. CTS ultimately paid off the DIP Loan in full on April 8, 2011.

## H. Critical Vendor/Independent Contractor Relations

Throughout the case, the Debtor has made considerable effort to maintain its relationships with the various Critical Vendors and Independent Contractors performing services for the CTS. Because these Critical Vendors and Independent Contractors are essential to the Debtor's continued business operations, the Debtor, in an exercise of its business judgment, determined that it was necessary to pay some or all of the pre-petition claims of those Critical Vendors and Independent Contractors who agreed to continue to provide post-petition services and terms comparable to the terms that existed prior to the Petition Date for CTS to (i) ensure continued and uninterrupted service and (ii) prevent the Critical Vendors and Independent Contractors from pursuing any collections rights they may have against the Debtor's Customers. While the Debtor believes such direct collection activities would be violations of both the agreements with many critical vendors and the automatic stay imposed under Section 362 of the Bankruptcy Code, any direct collection efforts against the Debtor's Customers would be devastating to the Debtor's business operations, as most of the Customers have already paid the Debtor for the shipments and would be subject to double liability, which would cause the Customers to terminate their business relationship with the Debtor. Accordingly, the Debtor sought determinations from the Bankruptcy Court that such actions by certain carriers or vendors were violations of the automatic stay. Certain other carriers have also sought relief from the automatic stay to collect amounts claimed due directly from shippers or consignors who utilized the Debtor's services. The Debtor has and will oppose such requests.

The Bankruptcy Court has not determined whether the CV/IC Creditors have any applicable non-bankruptcy rights to pursue the Debtor's Customers directly, whether any service agreement between the Debtor and the CV or IC Creditor would preclude the exercise of such rights, or whether the automatic stay or the discharge injunction would bar the CV/IC Creditor from pursuing the Customers. If, subsequent to the filing of the Plan and Disclosure Statement,

the Bankruptcy Court determines that the Critical Vendors and Independent Contractors are permitted to directly collect any pre-petition amounts due from the Customers directly based on applicable non-bankruptcy law or that inapplicability of the automatic stay or discharge injunction, the Plan provides that the CV/IC Non-Performing Creditors will be enjoined from pursuing the Debtor's Customers to avoid the catastrophic effect on the Debtor's business operations.

In order to avoid the devastating impact any dispute with Critical Vendors or Independent Contractors would have on the Debtor's business and reorganization, the Debtor sought such authority to pay the Critical Vendors and Independent Contractors from the Bankruptcy Court through the *Debtor's Emergency Motion to Pay Pre-Petition Claims of Critical Vendors* (Doc. No. 14) and the *Debtor's Emergency Motion to Pay Pre-Petition Claims of Independent Contractors* (Doc. No. 31). The Bankruptcy Court granted such relief through a series of interim and final orders establishing procedures for the payment of pre-petition Claims of critical vendors and independent contractors (defined in the Plan as the "CV/IC Orders").

Through the CV/IC Orders, the Court established a procedure by which the Debtor could obtain approval to pay Critical Vendors and Independent Contractors. Pursuant to the CV/IC Orders, the Debtor would periodically prepare a spreadsheet identifying the pre-petition claims the Debtor was requesting to pay, with any new requests highlighted, the amount of the pre-petition claims, the amounts paid to date towards the pre-petition debt, and the monthly payment terms. Absent objection, the Debtor was authorized to consummate the proposed settlement agreement with the respective Critical Vendor or Independent Contractor. The CV/IC Orders also provided that Critical Vendors and Independent Contractors who do not abide by the terms of their negotiated post-petition settlement agreements with the Debtor, including failing to continue to provide service to the Debtor, may be subject to avoidance action litigation and recovery of payments received under the agreement and will not be entitled to any future payment under such agreement.

Notwithstanding the entry of the CV/IC Orders, several LTL carriers threatened to try to collect unpaid pre-petition amounts owed by CTS directly from the Debtor's Customers. On January 31, 2011, the Debtor filed the *Debtor's Emergency Motion for an Order: (1) To Show Cause Why Certain Independent Contractors Should Not be Held in Contempt for Violation of the Automatic Stay; and (1) To Enforce the Automatic Stay* (Doc. No. 67) (the "Order to Show Cause") and identified certain LTL carriers who the Debtor believed intended to pursue the Debtor's Customers. The majority of the LTL carriers identified in the Order to Show Cause voluntarily agreed not to pursue the Debtor's Customers, absent the carrier seeking and the Bankruptcy Court granting relief from the automatic stay.

On February 4, 2011, the Debtor filed the *Debtor's Supplemental Emergency Motion for an Order: (1) To Show Cause Why Certain Independent Contractors Should Not be Held in Contempt for Violation of the Automatic Stay; and (2) To Enforce Automatic Stay*, (Doc. No. 89) (the "Supplemental Motion"), directed to certain additional Independent Contractors identified on Exhibit "A" to the Supplemental Motion (the "Additional Contractors"). On February 14, 2011, the Bankruptcy Court entered the *Order Granting Debtor's Supplemental Emergency Motion for an Order: (1) To Show Cause Why Certain Independent Contractors Should Not be*

*Held in Contempt for Violation of the Automatic Stay; and (2) To Enforce Automatic Stay*, (Doc. No. 141) (the "Supplemental OTSC Order"). The Supplemental OTSC Order provided in part that all independent contractors (except for certain less-than-load carriers addressed by a separate order) are put on notice that, pursuant to Section 362(a) of the Bankruptcy Code, they are enjoined from contacting Customers of the Debtor, including consignees and shippers, for the purpose of collecting debt. The Supplemental OTSC Order also provided that any Additional Contractor who violates the terms of the order shall be "subject to contempt and other sanctions, to include, without limitation, the imposition of fines and penalties, appropriate action by the U.S. Marshal, and the seizing of any property of the estate held by the offending Additional [Contractor]." In addition, paragraph 4 of the Supplemental OTSC Order provided that any Additional Contractor contesting the entry of the order shall have the right to file a motion for reconsideration within thirty (30) days of the entry of the Supplemental OTSC Order, and failure to timely file a motion for reconsideration shall constitute consent to the terms of the Supplemental OTSC Order.

Old Dominion and Estes subsequently filed motions for relief from stay, but such motions were resolved consensually in connection with settlement agreements securing Estes' and Old Dominion's future services and support as LTL carriers. The Debtor believes securing the continued services of a national preferred LTL carrier is important to the Debtor's future business plan and will avoid costly and unnecessary litigation regarding Estes' or Old Dominion's asserted rights to pursue the Debtor's Customers directly.

On June 14, 2011, the Bankruptcy Court entered the *Order Granting Debtor's Motion to Approve Critical Vendor Agreement with Estes Express* (Doc. No. 450). Under agreement between the Debtor and Estes, the Debtor agreed to pay Estes' pre-petition claim over a ten-month period commencing on July 1, 2011, and Estes restored the Debtor to favorable pre-petition pricing and provided a credit line, which increases as the Debtor make payments under an agreement with Estes.

On August 10, 2011, the Bankruptcy Court entered an *Order Granting Debtor's Motion to Approve Settlement Agreement with Old Dominion Freight Lines, Inc. (*Doc. No. 651). Under the settlement agreement with Old Dominion, the Debtor agreed to pay Old Dominion's pre-petition claim over a twelve-month period, and Old Dominion to resume post-petition services and reinstate pre-petition pricing and trade credit.

Estes' and Old Dominion's support of the Debtor will facilitate the growth of the LTL carrier management sector of the Debtor's business, which the Debtor believes is helpful to sustaining profitability with respect to that portion of its business model.

Notwithstanding the Supplemental OTSC Order, certain CV/IC Creditors continued to contact the Debtor's Customers directly in an attempt to collect a pre-petition obligation of the Debtor directly from the Customers based on applicable non-bankruptcy law rights asserted by the CV/IC Creditors. On July 20, 2011, the Debtor filed a *Verified Complaint for Declaratory Judgment that the Automatic Stay Applies or Alternatively, for Injunctive Relief*, commencing the adversary proceeding styled *Cargo Transportation Services, Inc. v. Taylor Truck Lines, Inc., et al*, which has been assigned Adv. No. 8:11-ap-00408-MGW, in addition to filing the *Debtor's*

*Motion for Preliminary Injunction with Supporting Memorandum of Law*.  Through these pleadings, the Debtor seeks to reaffirm that the automatic stay applies to bar certain CV/IC Creditors and anyone acting on their behalf, including any factoring companies and/or collection agencies, from pursuing the Debtor's Customers directly, and alternatively seeks an injunction pursuant to Section 105 of the Bankruptcy Code to enjoin the same parties from taking such actions against the Debtor's Customers in order to supplement and ratify the prior rulings of the Bankruptcy Court regarding the application of the automatic stay to such collection efforts and activities.  On July 20, 2011, the Debtor also filed a *Motion for Order to Show Cause Why the Mason-Dixon Lines, Inc., Universal Am-Can, Ltd., and Universal Truckload Services, Inc. Should Not Be Held in Contempt or Subject to Sanctions for Violation of the Supplemental OTSC Order* (Doc. No. 564).  These matters are presently pending before the Bankruptcy Court and are illustrative of the reason why the CV/IC Injunction contemplated in the Plan is critical, essential, and necessary to the Debtor's reorganization and to maximize recovery to all Classes of Creditors.

## I.        CLAIMS AGAINST COMERICA AND BBK

**A.**        Throughout the Bankruptcy Case, the Debtor has asserted that is has significant Causes of Action and Claims for damages against BBK and Comerica under various theories of lender and professional liability, breach of fiduciary duties, fraudulent inducement, and other theories. Pursuant to Order of the Bankruptcy Court, the Debtor has employed special counsel to investigate and evaluate all Claims against Comerica and BBK.  Under the terms of the Plan, Comerica, without any admission of liability, in exchange for the Carve-Out and other compromises provided in the Plan will be released from any liability that could be asserted by the Debtor, its Estate, or other parties.  The Debtor's Claim against BBK will be preserved and transferred to the Plan Trust under the Plan.  The Debtor believes it has significant Claims against BBK for its breach of fiduciary duties to the Debtor and fraudulent inducement, among other Causes of Action.  BBK was initially retained by the Debtor at Comerica's insistence to thoroughly examine the Debtor's accounts receivable following an audit by Comerica.  BBK failed to disclose any conflicts of interest with Comerica that would impair BBK's ability to objectively provide assistance to the Debtor.  Again, at Comerica's direction, the Debtor subsequently retained BBK as its chief restructuring officer (the "CRO").  The BBK employee designated as the CRO undermined the Debtor, destroyed employee morale by discrediting the Debtor's financial status to sales managers and staff, and planned to fire the Debtor's chief financial officer and seize control of the Debtor's bank accounts.  Although the Debtor ultimately terminated BBK, BBK's actions irreparably harmed the Debtor.

## V.        SUMMARY AND ANALYSIS OF CLAIMS

**B.        Other Secured Claims Summary Chart**

In addition to Comerica, a number of the Debtor's creditors have filed secured claims (classified in the Plan as "Other Secured Claims."  The Debtor believes many of these claims secured by various collateral, including vehicles, trailers, tractors, and office equipment may actually be financing agreement, as opposed to true leases.  The chart below summarizes the Secured Claims that have been filed in this case and provides the Debtor's current estimations of replacement value of the collateral to the extent available.

| POC # | Creditor | Collateral Description | Amount Filed or Scheduled Claim | Contractual Monthly Payment | Months Remaining Under Contractual Term | Estimated Replacement Value of Collateral |
|---|---|---|---|---|---|---|
| 76 | Credential | Office Furniture | $7,234.55 | $429.24 | 12 | $2,000.00 |
| 15 | GECC | Two 2005 Hyundai Reefer Trailers | $4,972.51 | $1,624.92 [*4] | 0 | $16,000.00 |
| 16 | GECC | Twenty 2009 Great Dane Trailers | $291,952.78 | $7,663.18 | 26 | $290,000.00 |
| 81 | Key | Three 2007 Freightliner Tractors | $93,976.64 | $6,261.98 [*5] | 12 | $80,000.00 |
| 62 | Mercedes | Two 2007 Freightliner Tractors | $79,387.72 | Unknown [*6] | | $60,000.00 |
| 63 | Mercedes | Two 2007 Freightliner Tractors | $83,048.37 | $4,639.71 [*7] | 14 | $70,000.00 |
| 64 | Mercedes | 2008 Freightliner Tractor | $39,470.11 | Unknown [*8] | | $35,000.00 |
| 84 | USB | Copier | $10,601.42 | $204.82 | 40 | $1,100.00 |
| | Toyota | Three Forklifts | Undetermined | Unknown | Unknown | $12,000.00 |
| 4 | WFFL | Two Komatsu and one Toyota Forklifts | $35,570.97 | $766.85 and $356.95 | 8 and 14 | $25,000.00 |
| 148 | Wells | Twenty 2007 Strick Dry Van Trailers | $158,256.55 | $397.50 | 8 | $158,256.55 |

| 149 | Wells | Twenty 2008 Strick Dry Van Trailers | $186,367.58 | $407.70 | 14 | $186,367.58 |
|------|-------|-------------------------------------|-------------|---------|----|-------------|
| 150 | Wells | Forty-five 2009 Great Dane Dry Vans | $625,201.10 | $383.56 | 19 | $625,201.10 |
| 151 | Wells | Four 2009 Great Dane Refrigerated Vans and Four Thermo King Refrigeration Units | $156,379.61 | $5,688.65 | 33 | $156,379.61 |
| 143 | FIFC | Unearned insurance premiums | $68,984.94 | $900.17 | 5 | N/A |
| | CoActive | Phone System | | | | |
| | TIP | Various Trailers | | | | |

1. This vehicle was provided for the business use of one of the Debtor's employees, who pays the contractual monthly lease payment due on the vehicle.
2. The Debtor's former employee pays the contractual monthly payment due on the vehicle. The Debtor allowed the employee to continue making the lease payment as part of his severance.
3. The Debtor's employee pays the contractual monthly lease payment due on the vehicle.
4. The Debtor collects income from the trailers derived from month-to-month rentals.
5. The Debtor collects income from the tractors derived from month-to-month rentals.
6. The Debtor collects income from the tractors derived from month-to-month rentals.
7. The Debtor collects income from the tractors derived from month-to-month rentals.
8. The Debtor collects income from the tractor derived from month-to-month rentals.
9. The Debtor's employee pays the contractual monthly lease payment due on the vehicle.
10. The Debtor's employee pays the contractual monthly lease payment due on the vehicle.


## VI.    HISTORICAL FINANCIAL PERFORMANCE AND FINANCIAL PROJECTIONS

Upon their employment in connection with this Bankruptcy Case, one of the first steps taken by the Debtor's counsel was to work closely with Debtor's management and the Financial Advisor ("FA") to develop financial models that accurately reflected both (a) the Debtor's pre-petition and post-petition historical financial performance and (b) reasonable projections as to future performance that would form the basis of a proposed Chapter 11 plan of reorganization (collectively, the "Projections"). To accomplish that task, the Debtor's management, the FA, and counsel reviewed and summarized historical financial information, including the monthly

operating reports filed in connection with the Debtor's Chapter 11 case. The results of those efforts are reflected in the following exhibits to this Disclosure Statement:

- o **Composite Exhibit "B"** summarizes the Debtor's pre-petition financial performance for the years 2007-2010 in the form of audited financial statements for 2007 and 2008, and unaudited financial statements for 2009 and 2010 (collectively, the "Pre-Petition Financial Information").

- o **Composite Exhibit "C"** sets forth monthly financial forecasts including (i) an income statement projection for October-December 2011 and the years 2012 through 2013; (ii) a balance sheet projection for October-December 2011 and the years 2012 through 2013; (iii) a cash flow projection for October-December 2011 and the years 2012 through 2013; and (iv) a projection reflecting liquidity sources and uses of funds as contemplated under the Plan (collectively, the "Financial Projections").

As demonstrated by the Financial Projections, the Reorganized Debtor, through continued operations funded through the Exit Funding and any additional post-Effective Date receivable financing, will generate sufficient cash flow to maintain and satisfy all current business operations and service its restructured secured debt obligations to other Secured Creditors (generally representing equipment leases or financing to be assumed and/or paid by the Reorganized Debtor). Payments to be made on account of the Reorganized Debtor include (i) Allowed Administrative Expense Claims, (ii) a reserve for making payments to CV/IC Performing Creditors with Allowed Class 5 Claims, and (iii) an Unsecured Carve-Out. In addition to the Unsecured Carve-Out, the Holders of Allowed Class 6 and 7 Claims shall also receive Distributions on account of the liquidation of any Plan Trust Assets. These Financial Projections include the Debtor's best estimates of payments that may be required under the Plan.

The Financial Projections and Claims Summary assume an Effective Date of October 1, 2011.

## VII.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

Under the Plan, the Debtor has established the various Classes of Creditors and Interest Holders pursuant to Section 1122 of the Bankruptcy Code. The Plan places the various Claims and Interests in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class or the treatment of such Claims or Interests is substantially similar. In general, the proponent of a Chapter 11 plan has broad discretion to classify Claims and Interests in the plan according to the particular facts and circumstances of each case. In re Holywell Corp., 913 F.2d 873, 880 (11th Cir. 1990). Pursuant to the Bankruptcy Code, the Debtor has not classified Administrative Expense Claims and Priority Tax Claims under the Plan. Holders of other Claims and Interests are classified in the Plan as follows:

| Class | Description | Status | Entitled to Vote |
|---|---|---|---|
| Class 1: | Unsecured Priority Claims | Unimpaired | No |
| Class 2: | Secured Claim of Comerica Bank | Impaired | Yes |
| Class 3(A): | Equipment Financing Claim of Ally | Unimpaired | No |
| Class 3(B): | Equipment Financing Claim of BMW | Unimpaired | No |
| Class 3(C): | Equipment Financing Claim of Credential | Impaired | Yes |
| Class 3(D): | Equipment Financing Claim of GECC | Impaired | Yes |
| Class 3(E): | Equipment Financing Claim of Key | Impaired | Yes |
| Class 3(F): | Equipment Financing Claim of Mercedes (as to tractors only) | Impaired | Yes |
| Class 3(G): | Equipment Financing Claim of USB | Impaired | Yes |
| Class 3(H): | Equipment Financing Claim of Toyota | Impaired | Yes |
| Class 3(I): | Equipment Financing Claim of WFFL | Impaired | Yes |
| Class 3(J): | Equipment Financing Claim of Wells | Impaired | Yes |
| Class 3(K): | Secured Claim of FIFC | Unimpaired | No |
| Class 3(L): | Secured Claim of CoActive | Impaired | Yes |
| Class 3(M): | Secured Claim of TIP | Impaired | Yes |
| Class 4: | Administrative Convenience Claims | Impaired | Yes |
| Class 5: | Performing CV/IC Claims | Impaired | Yes |
| Class 6: | Non-Performing CV/IC Claims | Impaired | Yes |
| Class 7: | General Unsecured Claims | Impaired | Yes |
| Class 8: | Intercompany Claims | Impaired | No |
| Class 9: | Equity Interests | Impaired | No |

The Debtor believes these classifications do not discriminate unfairly, that Claims in each Class are substantially similar to each other, that the separate classifications are based on the nature of the respective Claims and Interests, and that they are justified under the Bankruptcy Code and applicable law.

Any creditor of the Debtor that has or could assert any right to collect any amount owed by the Debtor from the Debtor's Customers is considered a CV/IC Creditor under the Plan. The Plan classifies CV/IC Creditors in one of two classes. CV/IC Creditors who have entered into agreements or obtained orders from the Bankruptcy Court approving agreements whereby the CV/IC Creditor has agreed to continue providing services to the Debtor on pre-petition pricing and terms are classified under Class 5 as CV/IC Performing Creditors. CV/IC Creditors who assert rights against Customers but have not agreed to provide continued services to the Debtor on pre-petition terms and pricing, who have not agreed not to pursue the Debtor's Customers, or are no longer performing under CV/IC Agreements are classified under Class 6 as CV/IC Non-Performing Creditors.

The Plan provides different treatment for CV/IC Creditors classified in Class 5 and Class 6. The Plan also provides for an injunction (defined in the Plan as the CV/IC Injunction) as of the Effective Date enjoining and prohibiting any CV/IC Creditor and their agents, employees, assigns, or anyone acting on their behalf, from contacting or otherwise attempting to collect any debt that would be owed to such CV/IC Creditor by the Debtor. The Plan further contemplates a special procedure by which a CV/IC Creditor could seek relief from such injunction

The Debtor believes it is appropriate to separately classify Performing CV/IC Creditors and Non-Performing CV/IC Creditors apart from General Unsecured Creditors because of (i) the nature of the CV/IC Creditor's contractual obligations with the Debtor, (ii) the nature of the essential services provided by the CV/IC Performing Creditors, and (iii) the actual or potential assertion of rights and remedies by the CV/IC Creditors against the Debtor's Customers. Furthermore, the Debtor believes the separate classification of CV/IC Performing Creditors and CV/IC Non-Performing Creditors is also necessary and appropriate. The Class 5 Creditors have entered settlement agreements with the Debtor and continue to perform under such agreements. Unlike General Unsecured Creditors, the Class 6 Creditors (i) entered pre-petition service agreements with CTS and are no longer performing under such agreements or are no longer deemed to be Critical Vendors by the Debtor and/or (ii) assert rights to pursue the Debtor's Customers directly for payment of amounts owed by the Debtor.

The table below summarizes the classification and treatment of the Claims and Interests under the Plan.

In all Classes, Claimants have the ability to consent to a treatment of their Claim that is different than that proposed under the Plan if such modification does not have a material adverse impact on other Creditor Classes. Additionally, the Debtor may modify, with the Bankruptcy Court's approval, the treatment currently proposed in the Plan. Any estimated Claim amounts are calculated as of the date of this Disclosure Statement. Estimated percentage recoveries are also set forth below for certain Classes of Claims.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. The Debtor has not yet fully analyzed all Proofs of Claim filed in the Chapter 11 Case to determine whether the amounts stated in such Proofs of Claim are accurate. The estimated Claim amounts set forth below are consolidated amounts based upon the Debtor's review of its books and records and of certain Proofs of Claim, and may include estimates of a number of Claims that are contingent, disputed, and/or unliquidated.

| Class Description | Summary of Treatment Under Plan |
|---|---|
| Administrative Expense Claims<br><br>(Estimated at approximately $750,000)*<br>SRBP          $160,000.00<br>CRG Partners   $175,000.00**<br>Jennis & Bowen   $150,000.00*<br>Committee<br> Professionals    Undetermined***<br>Ryder         $ 68,429.68<br>Non-Professional<br> Fees/Other<br> Administrative<br> Claim        $ 55,000.00****<br><br>*This amount assumes certain interim payments made to professionals as authorized by the Bankruptcy Court<br><br>**The Debtor has asserted Comerica owes at least $110,000 of this amount based on the *Interim Order (1) Granting Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Granting Replacement Liens Pursuant to Sections 105(a), 361, 363, 541 and 552 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure and (2) Granting Ore Tenus Joint Motion of the Debtor and Comerica Bank for Postpetition Financing* (Doc. No. 42). The Debtor anticipates that this issue will be resolved through the other compromises by Comerica reflected elsewhere in this Plan.<br><br>***One of the firms representing the Committee in this case has filed an application for allowance of fees and costs in the amount of $_____. Additional applications for compensation of Committee counsel may be filed. | Administrative Expense Claims shall include, among other amounts entitled to administrative status under Section 503, (i) the costs and expenses incurred in the operation of the business of the Debtor, including OCB Administrative Claims, (ii) Professional Fee Claims, and (iii) Administrative Expense Claims Allowed under Section 503(b)(3)(F).<br><br>(1)   Except as provided below, each Holder of an Administrative Expense Claim shall, in full and final satisfaction of such Allowed Administrative Expense Claim, be paid on the later to occur of (a) the Effective Date or (b) the date on which an Administrative Expense Claim shall become an Allowed Claim: (i) in full, in Cash from the Administrative Expense Carve-Out, the Allowed Amount of such Allowed Administrative Expense Claim, or (ii) in such other amount and on such other terms and conditions as may be agreed between the Holder of such Administrative Expense Claim and the Debtor.<br><br>(2)   Any timely filed and Allowed Section 503(b)(9) Claim shall be paid (i) in full, in Cash from the Administrative Expense Carve-Out, or (ii) in such other amounts and such other terms and conditions as may be agreed between the Holder of such 503(b)(9) Claim and the Debtor provided that (a) an application for allowance of such 503(b)(9) Claim shall have been filed by the deadline established by the Bankruptcy Court for the filing of Applications of Allowance of Administrative Expense Claims, (b) the amount asserted as a Section 503(b)(9) Claim has not been otherwise paid prior to the Effective Date, and (c) any amounts paid on account of an Allowed 503(b)(9) Claim shall reduce the Allowed Amount of any Unsecured Claim asserted by the Holder of the 503(b)(9) Claim.<br><br>(3)   Unpaid OCB Accounts Payable and Unpaid OCB Accrued Expenses as of the Effective Date shall be paid from the Effective Date Receivable Proceeds.<br><br>Administrative Expense Claims are not classified and are to be treated in accordance with the Bankruptcy Code and the Holders of Administrative Expense Claims are not entitled to vote on the Plan. |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| ****The Debtor disputes the validity of certain other requests for allowance of Administrative Claims | |
| <u>DIP Financing Claims</u><br><br>(Estimated at $0.00) | Any DIP Financing Claims have been or shall be paid on the Effective Date or as may be otherwise agreed between the Holders of the DIP Financing Claim. |
| <u>Priority Tax Claims</u><br><br>(Estimated at $5,000.00)<br><br>The only significant Priority Tax Claim to date was a $191,711.90 claim filed by the IRS for 2011 FICA/FUTA which has been paid through Debtor's payroll service | Priority Tax Claims are Claims of Governmental Units for taxes that are not Secured Claims and are entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.<br><br>Allowed Priority Tax Claims will be paid in full, in Cash, the later of: (a) the Effective Date; (b) the date of the Order allowing such Claim; or (c) the date that such Allowed Priority Tax Claim would have been due if the Reorganization Case had not been commenced; provided, however, that the Debtor may, at its option, in lieu of payment in full of Allowed Priority Tax Claims on the Effective Date, make deferred Cash payments with the principal amount of such Allowed Priority Tax Claims amortized and payable in equal annual installments over five (5) years from the Order of relief, and in such case interest shall accrue on the unpaid balance commencing on the Effective Date.<br><br>Priority Tax Claims are not classified, are to be treated as required by the Bankruptcy Code, and the Holders of such Claims are not entitled to vote on the Plan. |
| <u>Class 1 – Priority Claims</u><br><br>(Estimated at $5,000.00)<br><br>Southeastern has filed a claim seeking a priority amount for certain post-petition services which Debtor believes has been paid | Except as otherwise provided below, each Holder of an Allowed Priority Claim in this Class shall receive, in full satisfaction, settlement, release, and discharge thereof, Cash in the amount of such Allowed Priority Claim on the later of: (i) the Effective Date or as soon thereafter as practical; or (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Claim (or any other date specified in such Final Order) or as soon thereafter as practical.<br><br>Estimated Percentage Recovery: 100% |
| <u>Class 2 – Comerica Secured Claim</u><br><br>(Estimated at $6,576,289.40) | The entire Allowed Amount of Comerica's Claim shall be treated as an Allowed Secured Claim. The Allowed Amount of Comerica's Secured Claim shall be (a) as stipulated between the Debtor and Comerica or (b) as determined by the Bankruptcy Court, pursuant to Section 506(a) of the Bankruptcy Code and shall include any amounts the Bankruptcy Court determines should be allowed pursuant to Section 506(b) of the Bankruptcy Code for interest, reasonable fees, costs, or charges that may be provided for under the Comerica Loan Documents. On account of and in full satisfaction of the Comerica Secured Claim, Comerica shall |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | receive the following: |
| | (i)  the Comerica Base Receivable Proceeds within 60 days of the Effective Date; |
| | (ii) a Cash payment from the Reorganized Debtor in the amount of $125,000 within 30 days of the Effective Date in satisfaction of Comerica's Lien on the Effective Date Cash Assets; |
| | (iii) a Cash payment from the Reorganized Debtor in the amount of $100,000, less any amounts paid to Secured Creditors holding senior Liens on the Effective Date Fixed Assets, in full satisfaction of Comerica's Lien on the Effective Date Fixed Assets; |
| | (iv) all of the Debtor's right in other loans and advances as identified as a line item on the Debtor's Balance Sheet as attached to the Disclosure Statement; and |
| | (v)  any of the Debtor's rights in other miscellaneous loans and advances or other assets not otherwise specifically defined in this Plan; |
| | (vi) Forty percent (40%) of the Excess Effective Date Proceeds. |
| | **Reporting**.  From the Effective Date until the Comerica Base Receivable Proceeds are paid in full, the Reorganized Debtor shall provide to Comerica a weekly report showing all funds received and cash expenses paid during the prior week in a form and substance substantially similar to what has been provided to Comerica during the pendency of this Case and such additional reporting as may be agreed between the Debtor and Comerica prior to the Confirmation Date or specified in the Plan Supplement. |
| | **Liens**.  Subject to the Carve-Outs, Comerica shall retain any Liens(s) on the Comerica Collateral until the Comerica Base Receivable Proceeds and the Cash payments provided in subparagraphs (ii) and (iii) of Section 4.2.1 of the Plan are paid. |
| | **Release**.  Upon receipt of the Comerica Base Receivable Proceeds and the Cash payments provided in subparagraphs (ii) and (iii) of Section 4.2.1 of the Plan, Comerica will release (i) any Lien on the Comerica Collateral, and (ii) any Guarantor of the Comerica Loan from any liability in connection with the Comerica Loan. |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| Class 3(A) – Claim of Ally<br><br>Filed - $14,518.58<br><br>Estimated Replacement Value - $14,518.58 | The Claim(s) of Ally arising from leases of vehicles shall be treated in accordance with Article 7 of the Plan, or as otherwise agreed by Ally and the Debtor or ordered by the Court. |
| Class 3(B) - Claim of BMW<br><br>Filed - $43,930.82<br><br>Estimated Replacement Value - $43,930.82 | The Claim(s) of BMW arising from leases of vehicles shall be treated in accordance with Article 7 of the Plan, or as otherwise agreed by BMW and the Debtor or ordered by the Court. |
| Class 3(C) - Claim of Credential<br><br>Filed - $7,234.55<br><br>Estimated Replacement Value - $2,000.00 | The Allowed Class 3(C) Secured Claim of Credential shall be paid through monthly payments (a) deferred monthly payments that in the aggregate equal to the lesser of (i) the value of the Property securing such Allowed Claim (less any amounts paid as adequate protection prior to the Effective Date) as determined by the Bankruptcy Court in full satisfaction of such Allowed Class 3 Secured Claim or (ii) the amount of the Allowed Class 3 Secured Claim (less any amounts paid as adequate protection prior to the Effective Date) or (b) shall receive monthly payments as provided under the relevant financing agreement provide that any arrearage shall be paid in equal monthly payments in the same amount as the regular monthly payment due under the relevant financing agreement following the expiration of the stated lease or financing term until such arrearage is paid in full. |
| Class 3(D) - Claim of GECC<br><br>Filed - $296,925.29<br><br>Estimated Replacement Value - $290,000.00 | The collateral securing the Allowed Class 3(D) Secured Claim(s) of GECC shall be surrendered in full satisfaction of all Allowed Claim(s) of GECC. |
| Class 3(E) - Claim of Key<br><br>Filed - $93,976.64<br><br>Estimated Replacement Value - $80,000.00 | Key shall have an Allowed Class 3(E) Secured Claim in the amount of $93,976.64. Upon Confirmation, the balance of the Allowed Class 3(E) Secured Claim (less any amounts paid as adequate protection) shall accrue interest at the rate of 5.25% and shall be paid in eighteen (18) equal monthly installments with the first installment being due within fifteen (15) days of Confirmation and continuing on the fifteenth day of each subsequent month. |
| Class 3(F) - Claim of Mercedes<br><br>Filed - $242,618.39<br><br>Estimated Replacement Value - | The Allowed Class 3(F) Secured Claim(s) of Mercedes secured by the trailers shall be paid through (a) deferred monthly payments that in the aggregate equal to the lesser of (i) the value of the Property securing such Allowed Claim(s) (less any amounts paid as adequate protection prior to the Effective Date) as determined by the Bankruptcy Court in full satisfaction of such Allowed Class 3 Secured Claim(s) or (ii) |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| $165,000.00 | the amount of the Allowed Class 3 Secured Claim(s) (less any amounts paid as adequate protection prior to the Effective Date) or (b) shall receive monthly payments as provided under the relevant financing agreement provide that any arrearage shall be paid in equal monthly payments in the same amount as the regular monthly payment due under the relevant financing agreement following the expiration of the stated lease or financing term until such arrearage is paid in full. The Claim(s) of Mercedes arising from leases of vehicles shall be treated in accordance with Article 7 of the Plan, or as otherwise agreed by Mercedes and the Debtor or ordered by the Court. |
| Class 3(G) - Claim of USB <br><br> Filed - $10,601.42 <br><br> Estimated Replacement Value - $1,100.00 | The Allowed Class 3(G) Secured Claim of USB shall be paid through (a) deferred monthly payments that in the aggregate equal to the lesser of (i) the value of the Property securing such Allowed Claim (less any amounts paid as adequate protection prior to the Effective Date) as determined by the Bankruptcy Court in full satisfaction of such Allowed Class 3 Secured Claim or (ii) the amount of the Allowed Class 3 Secured Claim (less any amounts paid as adequate protection prior to the Effective Date) or (b) shall receive monthly payments as provided under the relevant financing agreement provide that any arrearage shall be paid in equal monthly payments in the same amount as the regular monthly payment due under the relevant financing agreement following the expiration of the stated lease or financing term until such arrearage is paid in full. |
| Class 3(H) - Claim of Toyota <br><br> Estimated Replacement Value - $12,000.00 | The Allowed Class 3(H) Secured Claim of Toyota shall be paid through (a) deferred monthly payments that in the aggregate equal to the lesser of (i) the value of the Property securing such Allowed Claim (less any amounts paid as adequate protection prior to the Effective Date) as determined by the Bankruptcy Court in full satisfaction of such Allowed Class 3 Secured Claim or (ii) the amount of the Allowed Class 3 Secured Claim (less any amounts paid as adequate protection prior to the Effective Date) or (b) shall receive monthly payments as provided under the relevant financing agreement provide that any arrearage shall be paid in equal monthly payments in the same amount as the regular monthly payment due under the relevant financing agreement following the expiration of the stated lease or financing term until such arrearage is paid in full. |
| Class 3(I) - Claim of WFFL <br><br> Filed - $35,570.97 <br><br> Estimated Replacement Value - | The Allowed Class 3(I) Secured Claim of WFFL shall be paid through (a) deferred monthly payments that in the aggregate equal to the lesser of (i) the value of the Property securing such Allowed Claim (less any amounts paid as adequate protection prior to the Effective Date) as determined by the Bankruptcy Court in full satisfaction of such Allowed Class 3 Secured Claim or (ii) the amount of the Allowed Class 3 Secured Claim (less any amounts paid as adequate protection |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| $25,000.00 | prior to the Effective Date) or (b) shall receive monthly payments as provided under the relevant financing agreement provide that any arrearage shall be paid in equal monthly payments in the same amount as the regular monthly payment due under the relevant financing agreement following the expiration of the stated lease or financing term until such arrearage is paid in full. |
| Class 3(J) - Claim of Wells<br><br>Filed - $1,126,204.84<br><br>Estimated Replacement Value - $1,000,000 | The Allowed Class 3(I) Secured Claim of WFFL shall be paid through (a) deferred monthly payments that in the aggregate equal to the lesser of (i) the value of the Property securing such Allowed Claim (less any amounts paid as adequate protection prior to the Effective Date) as determined by the Bankruptcy Court in full satisfaction of such Allowed Class 3 Secured Claim or (ii) the amount of the Allowed Class 3 Secured Claim (less any amounts paid as adequate protection prior to the Effective Date) or (b) shall receive monthly payments as provided under the relevant financing agreement provide that any arrearage shall be paid in equal monthly payments in the same amount as the regular monthly payment due under the relevant financing agreement following the expiration of the stated lease or financing term until such arrearage is paid in full.<br><br>(i) All adequate protection payments shall be applied to reduce the number of payments due under the treatments described below;<br><br>(ii) TRAILER LEASE NUMBER 144207/101: The Debtor shall make thirty-six (36) consecutive monthly payments of $3,550.00 due on the 1st day of each month commencing on August 1, 2011, and a balloon payment of $32,491.96 due on August 1, 2014;<br><br>(iii) TRAILER LEASE NUMBER 144207/102: The Debtor shall make forty-two (42) consecutive monthly payments of $4,200.00 due on the 1st day of each month commencing on August 1, 2011, and a balloon payment of $18,103.70 due on February 1, 2015;<br><br>(iv) TRAILER LEASE NUMBER 144207/103: The Debtor shall make forty-eight (48) consecutive monthly payments of $13,000.00 due on the 1st day of each month commencing on August 1, 2011 and a balloon payment of $51,317.40 due on August 1, 2015; and<br><br>(v) COMBINATION LOAN AND SECURITY AGREEMENT 701: The Debtor shall make thirty-six (36) consecutive monthly payments of $3,500.00 due on the 1st day of each month commencing on August 1, 2011 and a balloon payment of $61,089.26 due on August 1, 2014. |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| Class 3(K) - Claim of FIFC<br><br>Filed - $68,984.94 | The Allowed Class 3(K) Secured Claim of FIFC shall be paid through monthly payments pursuant to the terms of the existing premium financing agreement, and FIFC shall retain its lien in the unearned insurance premiums. |
| Class 3(L) - Claim of CoActive | The collateral securing the Allowed Class 3(L) Secured Claim(s) of CoActive shall be surrendered in full satisfaction of all Allowed Claim(s) of CoActive or, alternatively, at the election of CoActive may be purchased by the Exit Funder for $20,000 in full satisfaction of all Allowed Claims of CoActive. |
| Class 3(M) - Claim of TIP | The collateral securing the Allowed Class 3(M) Secured Claim(s) of TIP shall be surrendered in full satisfaction of all Allowed Claim(s) of TIP. |
| Class 4 – Administrative Claims<br><br>(Total Class 4 Claims Estimated at $400,000.00) | The Reorganized Debtor shall pay the Holders of Allowed Administrative Convenience Claims and the Holders of Allowed CV/IC Claims in the amount of $1,000 or less (or Allowed CV/IC Claims whose Holders elect to reduce such Allowed CV/IC Claim to the amount of $1,000), Cash from the CV/IC Carve-Out equal to twenty-five percent (25%) of the Allowed Amount of such Allowed Class 4 Claim within 30 days of the Effective Date. Provided, however, that to the extent that the Holder of any Allowed CV/IC Claim elects to be classified in Class 4, such CV/IC Creditor affirmatively agrees to accept the Distribution provided to the Holders of Allowed Class 4 Claims in full satisfaction of any and all Claims against the Debtor and/or the Debtor's Customers for the underlying freight services provided <u>and</u> agrees to be bound by the CV/IC Injunction. Acceptance and negotiation of the Distribution provided on account of Class 4 Claims shall constitute such Holder's consent to be bound by the CV/IC Injunction. |
| Class 5 – Performing CV/IC Claims<br><br>(Estimated remaining amounts to satisfy at approximately $700,000.00)*<br><br>*A significant portion of the Performing CV/IC Claims have been and continue to be paid during the Bankruptcy Case. | The Allowed Amount of Allowed CV/IC Claims of CV/IC Performing Creditors will be paid (i) pursuant to the terms of the CV/IC Settlement Orders entered with respect to such CV/IC Claim or (ii) in the absence of a CV/IC Settlement Order, the Allowed Amount of Allowed CV/IC Claims of any CV/IC Performing Creditor under any CV/IC Agreement that continues to provide services to the Debtor under the same or more favorable trade and/or credit terms as provided in the CV/IC Agreement shall be paid by the Reorganized Debtor in Cash from the CV/IC Carve-Out or from Cash from future operations (i) within 18 months of the Effective Date or (ii) on such other terms and conditions as may be agreed between the Reorganized Debtor and the Holder of such Allowed CV/IC Claim.<br><br>**Failure to Provide Services**. To the extent a CV/IC Creditor fails to continue to provide all services, rates, and pricing contemplated under any CV/IC Agreement after the |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Effective Date, any portion of such CV/IC Creditor's CV/IC Claim that remains unpaid as of the cessation of such services will be treated as a Class 7 General Unsecured Claim and any payments made on such CV/IC Claim prior to the cessation of such services may (i) be offset against any payments that would otherwise be made on account of such Class 7 Unsecured Claim of the CV/IC Creditor and (ii) to the extent in excess of payments that would otherwise be made on account of such Class 7 Unsecured Claim may be recovered as a CV/IC Clawback Recovery.<br><br>**Release of Avoidance Actions**. To the extent not otherwise released pursuant to a CV/IC Settlement Order, the entry of the Confirmation Order shall act as a release and discharge of the Holder of any Class 5 CV/IC Claims as of the Effective Date from any liability under Section 550 of the Bankruptcy Code with respect to any transfer that may be avoided under Section 547 or 553 of the Bankruptcy Code. |
| Class 6 – Non-Performing CV/IC Claims<br><br>(Estimated at $1,500,000)<br><br>The identity of those CV/IC Creditors whose Claims the Debtor currently believes are included in Class 6 are identified in the Schedule attached as **Exhibit "D"** to this Disclosure Statement. The Debtor intends that all of the CV/IC Creditors listed on Schedule "D" shall be subject to and bound by the CV/IC Injunction. This Schedule is subject to change to the extent any CV/IC Creditor obtains a CV/IC Settlement Order (as defined in the Plan) or otherwise reaches agreement with the Debtor as to payment terms of any CV/IC Claim. | Except as provided in Section 4.6.2, Allowed CV/IC Claims of CV/IC Non-Performing Creditors classified in Class 6 will be satisfied through the Pro Rata Distribution of the Plan Trust Assets on Distribution Dates that shall occur (i) within 120 days of the Effective Date, and (ii) on the First and Second Anniversary Dates. On the Effective Date, each Holder of an Allowed Class 6 Unsecured Claim will become a beneficiary of the Plan Trust. The Pro Rata Share of any Distributions that may be made by the Plan Trust on account of any Allowed Class 6 Claim will be calculated as a fraction of the amount of any such Distribution, the numerator of which shall be the Allowed Amount of such Allowed Class 6 Claim and the denominator shall be the aggregate Allowed Amount of all Allowed Class 6 and Class 7 Claims.<br><br>**Determination Procedures**. The entry of the Confirmation Order shall act as an injunction as of the Effective Date that shall prohibit and enjoin any act, demand, or proceeding to collect any amount that any CV/IC Creditor or other Creditor of the Debtor may claim or assert is owed by any Customer for freight transported, brokered, billed, or otherwise transacted by the Debtor. Any CV/IC Creditor classified in Class 6 or otherwise subject to the CV/IC Injunction may seek relief from the CV/IC Injunction by filing a Determination Motion within 60 days of the Effective Date identifying the specific relief sought, including the Customers that such CV/IC Creditor seeks to collect from and providing sufficient documentation for the Reorganized Debtor to evaluate such request, including any contract for carriage or freight transport between the CV/IC Creditor and the Debtor, any contract between the CV/IC Creditor and the Customer, and all Bills of Lading, account statements, invoices that support the assertion of liability by the Debtor's Customers to such CV/IC Creditor. Such |

| Class Description | Summary of Treatment Under Plan |
|---|---|
| | Determination Motion shall be filed with the Court and be served on the Reorganized Debtor, counsel for the Reorganized Debtor, and other parties receiving service via the Court's CM/ECF System.<br><br>The Reorganized Debtor shall have 30 days from the service of a Determination Motion and shall file either a consent to the Determination Motion with respect to all or any portion of the relief requested in the Determination Motion. To the extent the Reorganized Debtor consents to any portion of a Determination Motion, the CV/IC Injunction will be modified to permit the CV/IC Creditor filing the Determination Motion to exercise any remedies against the Customers identified in the consent.<br><br>To the extent the Reorganized Debtor objects to all or any portion of a Determination Motion, the Court will conduct a Determination Proceeding to determine the nature and extent of such CV/IC Creditor's rights to recovery from any Customer pursuant to applicable contract and law. To the extent the Bankruptcy Court determines that such CV/IC Creditor would have rights pursuant to applicable law or contract to pursue any Customer for amounts owed by or asserted as Claims against the Debtor, then, at the election of the Reorganized Debtor, (a) the CV/IC Creditor's Allowed CV/IC Claim shall be treated and paid as a Class 5 Claim or (b) the CV/IC Injunction will be modified to allow such CV/IC Creditor to exercise any available remedies for any portion of the Allowed Amount of its Allowed CV/IC Claim that will not be treated as a Class 5 Claim. |
| Class 7 - General Unsecured Claims<br><br>(Estimated at $2,000,000.00) (exclusive of CV/IC Creditors classified in Class 5 or Class 6) | Allowed Unsecured Claims classified in Class 7 will be satisfied through the Pro Rata Distribution of the Plan Trust Assets on Distribution Dates that shall occur (i) within 120 days of the Effective Date and (ii) on the First and Second Anniversary Dates. On the Effective Date, each Holder of an Allowed Class 7 Unsecured Claim will become a beneficiary of the Plan Trust. The Pro Rata Share of any Distributions that may be made by the Plan Trust on account of any Allowed Class 7 Claim will be calculated as a fraction of the amount of any such Distribution, the numerator of which shall be the Allowed Amount of such Allowed Class 7 Claim and the denominator shall be the aggregate Allowed Amount of all Allowed Class 6 and Class 7 Claims. |
| Class 8 - Intercompany Claims | All Intercompany Claims shall be cancelled as of the Effective Date and the Holders of such Claims shall waive any right to distribution on account of such Claims. |
| Class 9 – Equity Interests | All existing Equity Interests held in the Debtor shall be cancelled and terminated as of the Effective Date. |

The amount of Allowed Administrative Claims that must be paid prior to or on the Effective Date could vary significantly based on a number of factors, including the duration of the Bankruptcy Case, which in large control the extent of the professional fees incurred, and the resolution of several applications for administrative expense claims pending before the Bankruptcy Court, including claims asserted by MI Transportation, Inc., Enterprise Resource Technology Group, Inc., and affiliates of Chartis Insurance. The Court recently approved a settlement agreement between the Debtor and Ryder resolving Ryder's various claims against the estate, including its administrative expense claim. Presently, assuming that Confirmation occurs in September, the Debtor estimates professional administrative expense claims at $750,000.00.

The estimates for the aggregate amounts of Unsecured Claims set forth in various Classes under the Plan are based on the Debtor's best estimate of the amounts of such Claims as scheduled or filed as of the Petition Date, less amounts that may have been paid pursuant to CV/IC Orders or other authorized payments during the Bankruptcy Case. For other Claims, the calculation date is not necessarily the Effective Date of the Plan. The Effective Date will occur after the Confirmation Date, when the conditions precedent to the occurrence of the Effective Date are satisfied.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR AND THUS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

## VIII.   CLAIMS ALLOWANCE AND PAYMENT, EXECUTORY CONTRACTS, REVESTING OF ASSETS

### A.   Allowed Claims, Distribution Rights, and Objections to Claims.

#### (1)   Allowance Requirement

Only Holders of Allowed Claims are entitled to receive Distributions under the Plan. An Allowed Administrative Expense Claim is all or any portion of an Administrative Expense Claim (a) that has been allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (b) that was incurred by the Debtor in the ordinary course of business during the Chapter 11 Case. A post-petition obligation that is contingent or Disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding Claims arising under workers' compensation law), secondary payor liability, or any other Disputed legal or equitable Claim based on tort, statute, contract, equity or common law, is not considered to be an obligation that is payable in the ordinary course of business.

An Allowed Claim (other than an Administrative Expense Claim) is such Claim or any portion thereof (a) that has been allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (b) as to which (i) no Proof of Claim has been filed with the

Bankruptcy Court and (ii) the liquidated and non-contingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (c) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court, or (ii) any objection to its allowance has been settled, withdrawn, or denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.

In no event will those Administrative Expense Claims or those other Claims subject to disallowance under Section 502(d) of the Bankruptcy Code be deemed to be Allowed Claims.

(2)    <u>Interest on Claims; Dividends; Attorneys Fees</u>

The Plan provides that unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest, costs, and attorney's fees will not accrue or be paid on Claims, and no Holder of a Claim will be entitled to interest, costs, or attorneys' fees accruing on or after the Petition Date on any Claim or Equity Interest.

(3)    <u>Making of Distributions</u>

Reorganized Debtor, shall, following the Effective Date, be responsible for making (or causing to be made) Distributions under the Plan on account of Allowed Administrative Expense Claims and Allowed Claims in Classes 3, 4, and 5. The Plan Trustee will be responsible for making Distributions under the Plan on account of Allowed Claims in Classes 6 and 7. Unless otherwise ordered by the Court, Distributions to Holders of Allowed Claims will be made by the Reorganized Debtor (a) at the addresses set forth on the Proofs of Claim filed by such Holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Reorganized Debtor after the date of any related Proof of Claim, or after the date of the Schedules if no Proof of Claim was filed.

If any Holder's Distribution is returned as undeliverable, a reasonable effort will be made to determine the current address of such Holder, but no further Distributions to such Holder will be made unless and until the Reorganized Debtor are notified of such Holder's then current address, at which time all missed Distributions will be made to such Holder, without interest. Unless otherwise agreed by the Reorganized Debtor, amounts with respect to undeliverable Distributions made by the Reorganized Debtor will be returned to and for the benefit of the Reorganized Debtor.

All Claims for undeliverable Distributions must be made within the later of six (6) months after the Effective Date or six (6) months after Distribution is made to such Holder; after which date all Unclaimed Property will revert to the Reorganized Debtor free of any restrictions thereon and the Claims of any Holder or successor to such Holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

(4)     Means of Cash Payment

The Plan provides that Cash payments made pursuant to the Plan will be in U.S. funds, by the means agreed to by the payor and the payee, including by check, and/or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the payor will determine in its sole discretion.  For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency will be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

(5)     Fractional Distributions

The Plan provides that notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

(6)     De Minimis Distributions

The Plan provides that notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtor will not be required to distribute, and will not distribute, Cash to the Holder of any Allowed Claim if the amount of Cash to be distributed on account of such Claim is less than five dollars ($5.00).  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than five dollars ($5.00) will have such Claim discharged and will be forever barred from asserting such Claim against the Debtor, the Reorganized Debtor, or their respective property.  Any Cash not distributed pursuant to this provision will be the property of the Reorganized Debtor, free of any Liens, Claims, Interests, or restrictions thereon.

(7)     Reserves for Disputed Claims; Distributions on Account Thereof

The Plan contemplates the establishment and maintenance of Reserves on account of Class 6 and 7 Claims that are Disputed Claims as of the Effective Date.  No payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim.

With respect to any Administrative Expense Claim, other than an Administrative Expense Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court or that was incurred by the Debtor in the ordinary course of business during the Chapter 11 Case, a Disputed Claim is a Claim that is contingent or Disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding Claims arising under workers' compensation law), secondary payor liability, or any other Disputed legal or equitable Claim based on tort, statute, contract, equity, or common law.

With respect to any Claim that is not an Administrative Expense Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Disputed Claim is a Claim: (a) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or Disputed; (b) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, or which is otherwise Disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (c) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed; (d) for damages based upon the rejection by a Debtor of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code and as to which the applicable Bar Date has not passed; (e) that is Disputed under the provisions of the Plan; or (f) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

The Reorganized Debtor will, on the applicable Distribution Dates, make Distributions on account of any Disputed Claim that has become an Allowed Claim. Such Distributions will be made pursuant to the provisions of the Plan governing the applicable Class. Such Distributions will be based solely upon the amount of the Distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

(8)     Objection Procedures

All objections to Claims, other than Claims that are deemed to be Disputed Claims, must be filed and served on the Holders of such Claims by the Claims Objection Deadline. Objections to Claims (other than Administrative Claims), shall be filed on the later of ninety (90) days after the Effective Date, or (b) ninety (90) days after the applicable Proof of Claim is filed. If an objection has not been filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, unless such Proof of Claim asserts a Claim that is deemed to be a Disputed Claim, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier.

(9)     Estimation of Contingent or Unliquidated Claims

The Debtor or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or Reorganized Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as applicable and as determined by the Bankruptcy Court. If the

estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

(10)    <u>Impact of Disputed Claims on Unsecured Claims Recovery</u>

The Debtor may seek one or more Final Orders of the Bankruptcy Court disallowing certain Claims. However, to protect the rights of Holders of such Disputed Claims, the Plan proposes to establish a Disputed Unsecured Claims Reserve. The Debtor will seek to determine a maximum potentially allowable amount for all Disputed Claims, obtaining orders of the Bankruptcy Court where necessary to estimate or fix the maximum amount. It would be the Debtor's expectation that many of the Disputed Claims will be disallowed in whole or part, and that the funds placed in the Disputed Unsecured Claims Reserve on their account will not be distributed to the Holders of such Claims and the funds reallocated to other uses.

(11)    <u>Maximum Distributions for Claims</u>

No Holder of a Claim will receive a recovery that is valued as of the Effective Date to exceed 100% of such Holder's Allowed Claim. Likewise, no Holder of a Claim shall receive a recovery that exceeds 100% of such Holder's Allowed Claim as of the Effective Date resulting from a decrease in the amount of Administrative Expense Claims, Priority Claims, Priority Tax Claims, and Secured Claims as determined on the Effective Date and/or an increase in the amount of Cash available to the Debtor to satisfy such Claims as determined on the Effective Date.

(12)    <u>Reservation of Rights Regarding Claims</u>

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of Setoff or recoupment.

## B.    <u>Disposition of Executory Contracts and Unexpired Leases</u>

The Plan provides for the deemed assumption of all executory contracts or unexpired leases that have not been otherwise disposed of previously. Specifically, except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor will be deemed to have assumed each pre-petition executory contract and unexpired lease to which it is a party unless such contract or lease (a) was previously assumed or rejected upon motion by a Final Order, (b) previously expired or terminated pursuant to its own terms, or (c) is the subject of any pending motion, including a motion to assume, to assume on modified terms, to reject, or to make any other disposition filed by a Debtor on or before the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court under Section 365(a) of the

Bankruptcy Code approving the assumptions of pre-petition executory contracts and unexpired leases described above, as of the Effective Date.

(1)     Rejection Damages Bar Date for Rejections Pursuant to Plan

If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim will be forever barred and will not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel to the Reorganized Debtor within thirty (30) days after the notice of entry of the order authorizing the rejection of such executory contract or unexpired lease. The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease will have been evidenced by a Proof of Claim filed by earlier applicable bar dates or will be barred and unenforceable.

(2)     Cure with Respect to Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which any executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, under Section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided however, that the Reorganized Debtor will be authorized to reject any executory contract or unexpired lease to the extent the Reorganized Debtor, in the exercise of its sound business judgment, conclude that the amount of the Cure obligation, as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to the Reorganized Debtor. **THE DEBTOR DOES NOT BELIEVE ANY CURE IS REQUIRED WITH RESPECT TO ANY EXECUTORY CONTRACTS OR LEASES THAT WILL BE ASSUMED.**

**C.     Revesting of Assets; Release of Liens**

The property of the Debtor's Estate, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of or abandoned pursuant to the Plan, will revest in the Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of the Reorganized Debtor will be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided under the Plan.

# IX. POST-CONSUMMATION CORPORATE STRUCTURE, MANAGEMENT, AND OPERATION, DISCHARGE INJUNCTIONS

## A. Continued Corporate Existence

The Plan provides that Debtor will remain in existence in accordance with the applicable laws in the respective jurisdictions in which they are incorporated.

## B. Post-Consummation Governance Documents

The governing corporate documents for the Debtor may be amended as necessary to include a provision prohibiting the issuance of non-voting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

## C. Officers and Directors of Reorganized Debtor

The Debtor currently anticipates that the Board of the Reorganized Debtor shall be the same persons who served in such capacity prior to the Petition Date. Specifically, the Debtor anticipates that the Members shall continue to serve in their respective existing capacities subsequent to the Effective Date, unless and until a new Board is elected or appointed pursuant to the applicable governing documents and applicable laws.

## D. Corporate Action

On the Effective Date, the adoption and filing of any restated articles of incorporation, the appointment of directors and officers of Reorganized Debtor, and all actions contemplated by the Plan will be authorized and approved in all respects pursuant to the Plan. All matters provided for in the Plan involving the corporate structure of the Debtor or Reorganized Debtor and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the stockholders or directors of the Debtor or Reorganized Debtor. On the Effective Date the appropriate officers or directors of the Reorganized Debtor will be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor without the need for any required approvals, authorizations, or consents, except for express consents required under the Plan.

### (1) Discharge and Discharge Injunction

Confirmation of the Plan effects a discharge of all Claims against the Debtor. As set forth in the Plan, except as otherwise provided therein or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties and, regardless of whether any property will have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtor will be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not

limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such Debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) a Claim based upon such Debt is Allowed under Section 502 of the Bankruptcy Code, (iii) a Claim based upon such Debt is or has been Disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such Debt accepted the Plan.

Under the Plan, as of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons will be precluded from asserting against the Debtor or the Reorganized Debtor, directly or indirectly, any other or further Claims, Debts, rights, causes of action, Claims for relief, liabilities, or Equity Interests relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

In furtherance of the discharge of Claims, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other Debt or liability that is discharged or an Interest or other right of an Equity Security Holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, and their respective subsidiaries or their property on account of any such discharged Claims, Debts, or liabilities: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a Setoff, right of subrogation, or recoupment of any kind against any Debt, liability, or obligation due to the Debtor or the Reorganized Debtor; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

(2)  Discharge of Claims and Non-Debtor Releases by Debtors.

**AS A CONDITION OF THE CARVE-OUTS AND COMERICA'S SUPPORT OF THE PLAN, EFFECTIVE AS OF THE EFFECTIVE DATE, DEBTOR AND THE REORGANIZED DEBTOR WILL BE DEEMED TO HAVE FOREVER RELEASED, WAIVED, AND DISCHARGED THE RELEASEES FROM ANY AND ALL CLAIMS, SUITS, CONTROVERSIES, CAUSES OF ACTION, DAMAGES, JUDGMENTS, EXECUTIONS, DEMANDS, COUNTERCLAIMS, COSTS, EXPENSES, THIRD PARTY CLAIMS, CROSSCLAIMS, CHOSES IN ACTION, DEFENSES, PROMISES, DEBTS, RIGHTS, AGREEMENTS, RIGHTS TO REMEDIES, AND LIABILITY WHATSOEVER INCLUDING, WITHOUT LIMITATION, ANY CLAIM UNDER SECTION 506(C) OF THE BANKRUPTCY CODE (OTHER THAN THE RIGHTS OF DEBTOR OR REORGANIZED DEBTOR TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR**

DOCUMENTS DELIVERED THEREUNDER), WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, WHETHER LIQUIDATED OR UNLIQUIDATED, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE, INCLUDING ACTIONS IN CONNECTION WITH INDEBTEDNESS FOR MONEY BORROWED BY DEBTOR, TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO DEBTOR, THE REORGANIZED DEBTOR, THE REORGANIZATION CASE, OR THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN.

(3)     CV/IC Injunction.

UPON ENTRY OF THE CONFIRMATION ORDER ANY CV/IC CREDITOR OR THEIR AGENTS, EMPLOYEES, AND/OR ASSIGNEES, THAT HAS, MAY HAVE, CLAIMS, ASSERTS, OR MAY CLAIM OR ASSERT ANY APPLICABLE RIGHTS OR ABILITY TO PURSUE OR COLLECT FROM THE DEBTOR'S CUSTOMERS DIRECTLY OR INDIRECTLY ON ACCOUNT OF ANY CLAIMS, LIABILITIES, OR OBLIGATIONS, OR OTHER AMOUNTS CLAIMED TO BE OWED ARISING OUT OF OR IN CONNECTION WITH ANY BUSINESS OR FREIGHT TRANSACTIONS BETWEEN, BROKERED, BY, INVOICED, OR BILLED TO OR FROM SUCH CV/IC CREDITOR AND THE DEBTOR, SHALL BE ENJOINED AND PROHIBITED FROM CONTACTING, MAKING ANY DEMAND UPON, PURSUING, OR OTHERWISE TAKING ANY ACTION TO COLLECT OR FOR THE PURPOSE OF COLLECTING SUCH CLAIMS FROM ANY OF THE DEBTOR'S CUSTOMERS.     ANY OTSC INJUNCTION ENTERED DURING THE REORGANIZATION CASE SHALL REMAIN IN FULL FORCE AND EFFECT FOLLOWING THE EFFECTIVE DATE.     THE CONFIRMATION ORDER SHALL CONTAIN THE APPROPRIATE INJUNCTIVE LANGUAGE AS DETERMINED BY THE BANKRUPTCY COURT TO EFFECTUATE THE SCOPE AND EXTENT OF THE CV/IC INJUNCTION.

(4)     Release by Holders of Claims and Equity Interest Holders.

EFFECTIVE AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, IN CONSIDERATION FOR THE OBLIGATIONS OF THE PERSONS SET FORTH BELOW UNDER THE PLAN AND, IF APPLICABLE, DISTRIBUTIONS UNDER THE PLAN, CONTRACTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS TO BE DELIVERED IN CONNECTION WITH THE PLAN, EACH HOLDER OF A CLAIM THAT IS NOT A RELEASEE AND EACH EQUITY INTEREST HOLDER AND ANY AFFILIATE OF ANY SUCH HOLDER OF A CLAIM OR EQUITY INTEREST HOLDER (AS WELL AS ANY TRUSTEE OR AGENT ON BEHALF OF EACH SUCH HOLDER OF A CLAIM

**THAT IS NOT A RELEASEE OR EQUITY INTEREST HOLDER) SHALL BE DEEMED TO HAVE FOREVER WAIVED, RELEASED, AND DISCHARGED (I) DEBTOR, (II) THE REORGANIZED DEBTOR, AND (III) THE RELEASEES FROM ANY AND ALL CLAIMS, SUITS, CONTROVERSIES, CAUSES OF ACTION, DAMAGES, JUDGMENTS, EXECUTIONS, DEMANDS, COUNTERCLAIMS, COSTS, EXPENSES, THIRD PARTY CLAIMS, CROSSCLAIMS, CHOSES IN ACTION, DEFENSES, PROMISES, DEBTS, RIGHTS, AGREEMENTS, RIGHTS TO REMEDIES, AND LIABILITY WHATSOEVER WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE, INCLUDING ACTIONS IN CONNECTION WITH INDEBTEDNESS FOR MONEY BORROWED BY DEBTOR, TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO DEBTOR, THE REORGANIZED DEBTOR, THE REORGANIZATION CASE, OR THE PLAN. THE AFFIRMATIVE VOTE BY ANY CREDITOR IN FAVOR OF THE PLAN WILL BE DEEMED TO BE A CONSENT TO THE RELEASES AS CONTEMPLATED HEREIN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN.**

### E.     Necessity of Releases

Courts in the Eleventh Circuit have acknowledged a bankruptcy court's ability to approve non-debtor releases, both in settlement agreements and chapter 11 plans, so long as certain standards are met. *See In re Munford, Inc.*, 97 F.3d 449 (11th Cir. 1996); *see also In re Transit Group*, 286 B.R. 811 (M.D. Fla. 2002). In those cases, courts have generally considered whether the requested releases were crucial to the success of the bankruptcy case, that the requested non-debtor releases are fair and necessary, and that the releases be given in exchange for appropriate consideration.

The Debtor believes its Reorganization Case involves the unusual circumstances that justify the non-debtor releases and injunctions provided in the Plan. The unique circumstances of this Reorganization Case include (i) the necessity of the support provided by Comerica in the negotiation and formulation of the amended Plan, (ii) Comerica's agreement to provide a significant Carve-Out to Creditors of the Estate discount of its Allowed Secured Claim, the Exit Funder's agreement to provide funding conditioned upon the requirement (both as a practical matter and as a material condition to the Exit Funder's willingness to provide the Exit Funding) that David Bell, Jeff Maser, Bill Nichols, and other management remain active in the Debtor's management, and (iii) the multiple controversies that would otherwise likely need to be determined that would threaten the success of this Reorganization Case. As demonstrated throughout the case by the actions and positions asserted by CV/IC Creditors, the CV/IC Injunction is necessary to prevent CV/IC Non-Performing Creditors from eviscerating the

Debtor's Customer base. While the Debtor does not believe the majority of the CV/IC Non-Performing Creditors would prevail in their efforts to assert claims against the Debtor's Customers under applicable non-bankruptcy law, the mere threats to pursue the Debtor's Customers by CV/IC Non-Performing Creditors would be highly damaging to the Debtor's business operations, in addition to jeopardizing relationships with Customers and future generation of income.

These and other circumstances justify the requested non-debtor releases and injunctions. Simply stated, without the releases and CV/IC Injunction contemplated by the Plan, Comerica would not agree to the terms of the Plan and related Carve-Outs, Comerica could not be reasonably assured of receipt of the Comerica Base Receivable Proceeds, and the Exit Funder would not provide Exit Funding. The Carve-Outs and Exit Funding are unquestionably essential elements of the Debtor's ultimate reorganization, are necessary to any recovery for Creditors, and add value to the Debtor's and Reorganized Debtor's assets and ability to pay Claims under the Plan. In addition, the terms of the Exit Funding make it necessary for David Bell, Jeff Maser, Bill Nichols, and other management to be able to actively focus on the management of the Debtor, its continued reorganization efforts, and the maximization and collection of the Effective Date Total Proceeds which provide the primary source of payment and recovery to Creditors under the Plan. Accordingly, the injunctions and releases of non-debtors under the Plan are necessary to make the Plan both feasible and confirmable.

## X.  PREFERENCES, FRAUDULENT CONVEYANCES, AND OTHER CAUSES OF ACTIONS

Under the Plan, all Claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person ("Causes of Action") are retained by the Debtor after confirmation of the Plan (except to the extent such Claims are expressly released under the Plan). The Debtor may also elect, prior to confirmation, to pursue litigation against any Person (and/or any related guarantees) arising out of a debt to the Debtor. The Plan provides that except as otherwise provided in the Plan or the Confirmation Order, or in any contract instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, the Debtor or Reorganized Debtor will retain all of the respective Causes of Action that the Debtor or Reorganized Debtor may hold against any Person. The Debtor or Reorganized Debtor will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Causes of Action. The Debtor or Reorganized Debtor or their respective successor(s) may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan. Specifically, but without limitation, the Debtor intends to investigate and potentially pursue Comerica on various theories of lender liability.

Causes of Action include potential avoidance or other bankruptcy Causes of Action. Such Causes of Action may exist as a result of "preferential" payments or other transfers made by the Debtor on account of antecedent debts within ninety (90) days of the Petition Date, or one (1) year in the case of Insiders. The deadline for commencing preference actions is two (2) years

after the Petition Date. Other causes of action may exist as a result of transfers made by the Debtor that may be avoidable under Section 548 of the Bankruptcy Code as made while the Debtor was insolvent and for less than reasonable equivalent value. The deadline for commencing transfer actions under the Bankruptcy Code is two (2) years after the Petition Date.

CTS is an "S corporation," and as such, cannot make disproportionate distributions to its shareholders. In 2008, in addition to her salary, Stacey Bell received $50,000.00 in shareholder distributions per month from CTS for a ten (10) month period. The payments to Mrs. Bell were properly characterized as distributions and not as salary or a bonus because Mrs. Bell was not providing services to CTS. CTS also made additional advances to or for the benefit of Mrs. Bell. CTS correctly reflected these additional payments to or for the benefit of Mrs. Bell as shareholder distributions and did not take an income tax deduction for the expenditures. Ann Manning did not receive corresponding distributions. Subsequently, in connection with the 2008 audit of financial statements, CTS' accounting professionals advised that, to avoid losing S-corporation status, the distributions to Mrs. Bell should be reflected as a shareholder loan that would be repaid through future distributions to Mrs. Bell and Mrs. Manning as shareholders, with no specific maturity date (the "Shareholder Loan").

In 2009 and 2010, CTS determined in would not make future shareholder distributions to Mrs. Bell and Mrs. Manning in order to fund additional business operations and ensure sufficient liquidity to meet its obligations, notwithstanding the fact that such distributions were necessary to pay back the Shareholder Loan. In late 2010, Comerica demanded that the Shareholder Loan be evidenced by a promissory note in the amount of $955,988.00. The Debtor executed an allonge purportedly assigning note to Comerica as additional security, together with full disclosure of the transactions giving rise to the obligation.

The Debtor believes that CTS was in fact solvent and meeting its obligations to creditors as they came due, at all times when distributions or advances comprising the obligation evidenced by the Shareholder Note were made.

A decision with respect to whether to pursue such transfers, including any transfers in connection with Shareholder Loans, will be made by the new Board prior to the expiration of that deadline. All Creditors and other parties who received potentially preferential payments are advised that such payments are subject to possible avoidance in proceedings to be commenced by the Reorganized Debtor. The Debtor do not anticipate that the pursuit of preference or other avoidance actions will yield recoveries that will materially impact or enhance value or be of material benefit to Creditors. In fact, the Board may decide that the interests of the Reorganized Debtor would not be served by pursuing any such actions, as doing so could impair valuable relationships with continuing vendors and suppliers.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, Reorganized Debtor shall retain and have the exclusive right to enforce any and all causes of action and rights of the Debtor that arose both before and after the Petition Date ("Causes of Action"), including the rights and powers of a trustee and debtor-in-possession and all causes of action granted pursuant to and still existing under Sections 502, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code ("Avoidance Actions"), other than those expressly released, compromised, or assigned as part of

or pursuant to the Plan. In addition, Causes of Action include non-bankruptcy Claims, rights of action, suits, or proceedings that arise in the ordinary course of the Debtor's business. The Debtor has not completed its analysis of available Avoidance Actions or the merits of any Causes of Action or Avoidance Actions.

If, as a result of the pursuit of any Causes of Action, a Claim would arise from a recovery pursuant to Section 550 of the Bankruptcy Code after Distributions under the Plan have commenced, making it impracticable to treat the Claim in accordance with the applicable provisions of the Plan, the Reorganized Debtor will be permitted to reduce the recovery by an amount that reflects the value of the treatment that would have been accorded to the Claim, thereby effectively treating the Claim through the reduction.

## XI.     RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND ANY SUPPLEMENTS TO THIS DISCLOSURE STATEMENT) PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.     General Bankruptcy Risk Factors

(1)     Parties In Interest May Object to the Debtor's Classification of Claims or Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, the Debtor cannot assure you that the Bankruptcy Court will reach the same conclusion.

(2)     The Possible Loss of Favorable Tax Attributes

Although the Debtor does not believe that implementation of the Plan will itself result in significant tax liability, the proposed transactions could potentially reduce any favorable tax attributes that the Debtor may otherwise be entitled to. The reduction of, and potential limitations on the Debtor's ability to use such favorable tax attributes could adversely affect the Reorganized Debtor's financial position in future years.

(3)     The Debtor May Not Be Able to Secure Confirmation of the Plan

The Debtor cannot assure that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, the Debtor cannot assure you that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of a Claim or Equity Interest

might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any statutory requirements for confirmation had not been met.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization and that value of Distributions to non-accepting Holders of Claims and Interests within a particular class under the plan will not be less than the value of Distributions such Holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan will not be followed by a need for further financial reorganization and that Holders within each Class under the Plan will receive Distributions at least as great as would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all Administrative Expense Claims and the costs and uncertainty associated with any such Chapter 7 case.

(4)     Conditions to Confirmation and Effective Date

Article 9 of the Plan contains several conditions to both Confirmation and the occurrence of the Effective Date. Failure to satisfy any of these conditions could impact the Debtor's ability to confirm and/or consummate the Plan.

## B.     **Uncertainty of Financial Projections**

The Financial Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor, and some or all of which may not materialize. The Financial Projections are primarily based on "rolling forward" the Debtor's pre-confirmation balance sheet with adjustments made for the anticipated impact of the financial restructuring under the Plan. The Financial Projections do not reflect possible additional adjustments that may be required and/or warranted under applicable laws, rules, or regulations such as those promulgated by the Internal Revenue Service or associated with Generally Accepted Accounting Principles.

To the extent that any assumptions are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor. Some or all of the assumptions may not be realized and that actual results may vary. Financial information

contained in the Financial Projections should not be regarded as a representation or warranty by the Debtor or any other Person that such projections can or will be achieved.

## C.    **Operational Risk Factors**

The Debtor will face a number of risks with respect to its continuing business operations upon emergence from Chapter 11, including but not limited to the following:  the Debtor's ability to improve profitability; the Debtor's response to the entry of new competitors into its markets; the Debtor's ability to reduce the level of operating losses experienced in recent years; the Debtor's ability to upgrade its information systems and implement new technology and business processes; retention of key employees; the Debtor's ability to successfully implement effective business continuity; changes in federal, state or local laws or regulations; general economic conditions in the Debtor's operating regions; increases in labor and employee benefit costs, such as health care and related expenses; and changes in accounting standards, taxation requirements, and bankruptcy laws.

## XII.    **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

## A.    **General**

The tax consequences of the Plan to the Debtor and to Holders of Claims and Equity Interests are discussed below.  This discussion of the federal income tax consequences of the Plan under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "IRC" or "Tax Code"), is provided for informational purposes only.  While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties.  Moreover, the consequences to a Holder of Claims and Equity Interests may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of taxpayers holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holders' particular tax situations.  In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**THE DEBTOR'S BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.  HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES.**

## B.    **Certain U.S. Federal Income Tax Consequences of the Plan to CTS.**

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year, which generally includes the amount of principal debt discharged and any interest that has been previously accrued and deducted for tax purposes but remains unpaid at the time the indebtedness is discharged.  The Tax Code permits a debtor in bankruptcy to

exclude its COD Income from gross income, but requires the debtor to reduce certain tax attributes by the amount of the excluded COD Income. A debtor's tax attributes include net operating loss ("NOL") carry forwards, current year NOLs, tax credits, and tax basis in assets (collectively, "Tax Attributes"). To the extent the amount of excluded COD Income exceeds the Tax Attributes, the remaining COD Income generally has no adverse federal income tax consequences.

It is likely that the Debtor will realize a significant amount of COD Income upon the consummation of the Plan. The Debtor will not be required to include COD Income in gross income because the indebtedness will be discharged while the Debtor is under the jurisdiction of a court in a Title 11 case. Instead, the Debtor will be required to reduce Tax Attributes by the amount of the COD Income realized. The Debtor have not yet determined whether it would be beneficial to make an election available under the Tax Code to reduce the basis of their depreciable property prior to any reduction of other Tax Attributes. The extent to which Tax Attributes remain following Tax Attribute reduction, and the extent of the reduction in the basis of the Debtor's assets, will depend upon the amount of the COD Income.

## C. Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests

The U.S. federal income tax consequences to holders of allowed claims arising from the distributions to be made in satisfaction of their claims pursuant to a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the holder of a claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the corporation; (d) whether such claim constitutes a security; (e) whether the holder of a claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the holder of a claim receives distributions under the bankruptcy plan in more than one taxable year. For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place. In addition, where a gain or loss is recognized by the holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to the underlying claim. A holder who purchased its claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

(1)      Accrued but Unpaid Interest.

In general, to the extent a holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, such a holder generally recognizes a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full.

The extent to which property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear.  Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes.  However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each Holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes.

(2)      Consequences to Holders of Secured Claims.

The following discussion assumes that each Holder of an Allowed Secured Claim holds such Claim as a "capital asset" within the meaning of Section 1221 of the IRC.  If an Allowed Secured Claim remains secured by a Lien on the Debtor's Assets, the Holder of such Claim should not recognize a gain or less except to the extent Collateral securing such Claim is changed, and the change in Collateral constitutes a "significant modification" of the Allowed Secured Claim within the meaning of Treasury Regulations promulgated under Section 1001 of the IRC.  If an Allowed Secured Claim is paid in full in Cash, the Holder should recognize a capital gain or loss (which capital gain or loss would be a long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its Claim for more than one (1) year) in an amount equal to the amount of Cash received over the Holder's adjusted basis in the debt instrument(s) underlying its Allowed Secured Claim.  To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income.

(3)      Consequences to Holders of Priority Claims.

To the extent that the Holder of an Allowed Priority Claim receives a Distribution under the Plan, such Holder should recognize such Distribution as ordinary income and submit the appropriate withholdings based on that Holder's particular circumstances.  The Reorganized Debtor shall make any appropriate withholdings from such Distributions.

       (4)       <u>Consequences to Administrative Convenience Claims</u>.

In general, the receipt of Cash payments in respect of Administrative Convenience Claims should be treated as a taxable exchange for U.S. federal income tax purposes. Accordingly, Holders of Claims (including Holders of Claims in Class 7 that elect to reduce their Claims for a discounted Cash payment, but only to the extent such alternative is available) should recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the Cash payments received and such Holder's adjusted tax basis in its Claim.

       (5)       <u>Consequences to the Receipt of "S Corporation" Stock</u>.

The Debtor is currently taxed as an "S corporation" or "qualified subchapter S subsidiary" under the Tax Code. A shareholder of an "S corporation" must pay tax on his or her Pro Rata Share of the income of the "S corporation," regardless of whether the S corporation distributes any of that income to the "S corporation" shareholders. To the extent that an "S corporation" recognizes taxable income that it does not distribute to its shareholders, the Shareholders may recognize "phantom income" (<u>i.e.</u>, the shareholder may be taxed on income that he or she did not receive).

       (6)       <u>Consequences to Holders of Unsecured Claims</u>.

To the extent the Holder of an Allowed General Unsecured Claim receives less than full payment on account of such Claim, the Holder of such Claim may be entitled to assert a bad debt deduction or worthless security deduction with respect to such Allowed Unsecured Claim.

To the extent that any amount received by a Holder of an Allowed Unsecured Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of an Allowed Unsecured Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtor. Such loss may be ordinary, but the tax law is unclear on this point.

       (7)       <u>Consequences to Holders of Equity Interests</u>.

CTS is recognized as a "pass through" entity under the IRC. As such, the tax consequences of CTS' generation of a profit or loss in a given year generally "pass through" to CTS' Equity Holders. The allocations of the profits and losses are generally governed by the ownership allocation of the company. As such, the tax consequences of the Plan will vary depending on the specific circumstances of each Equity Holder.

D.      **Backup Withholding and Reporting**

The Reorganized Debtor will withhold all amounts required by law to be withheld from payments subject to federal taxes, if any, and will comply with all applicable reporting requirements of the IRC.

E.      **IRS Circular 230 Notice**

Any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the IRC or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.

## XIII.   FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

A.      **Feasibility of the Plan**

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

In determining the feasibility of the Plan, the Debtor has relied upon the Financial Projections attached to this Disclosure Statement as **Composite Exhibit "C."**  The Financial Projections indicate that the Reorganized Debtor should have adequate cash flow to pay and service its debt obligations and to fund its operations.  Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other Claims; and other matters, many of which will be beyond the control or knowledge of the Debtor and some or all of which may not materialize.

The Debtor may update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events.

B.      **Liquidation Analysis**

Even if a plan is accepted by each class of creditors and equity security holders, in order to confirm a plan of reorganization, the Bankruptcy Court must independently determine that the plan is in the best interests of all classes of creditors and equity security holders impaired by the

plan. The "best interests" test requires that the Bankruptcy Court find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide such member a recovery that has a value at least equal to the value of the distribution that each such member would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate what members of each impaired class of creditors and equity security holders would receive if a debtor were liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of the collateral and, then, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and its Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in this Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are Allowed in the Chapter 7 case, litigation costs and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself could trigger certain priority claims, such as claims for severance pay, and could accelerate other priority payments that otherwise would be due in the ordinary course of business, such as litigation costs and claims arising from the wind-down of the debtor's operations during the Chapter 7 case. Those administrative and priority claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay general claims or to make any Distribution in respect of Equity Interests.

The Debtor believe that a Chapter 7 liquidation would result in recoveries substantially less than the recoveries expected to be received pursuant to the Plan and that these reduced recoveries would be received at a much later time. Additional administrative expenses would result from the appointment of a trustee or trustees and corresponding professionals. Furthermore, the Debtor believes that substantial additional Claims would result from cessation of its operations.

Attached hereto as **Exhibit "E"** is the Liquidation Analysis for the Debtor assuming a hypothetical Chapter 7 liquidation in which a court-appointed trustee liquidates the company's assets pursuant to an orderly liquidation.

The Liquidation Analysis is based on a number of estimates and assumptions which, while considered reasonable, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor or any Chapter 7 trustee. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtor were, in fact, to undergo such a Chapter 7 liquidation, and actual results could vary materially from those shown here. In addition, any liquidation would necessarily take place in the future under circumstances which presently cannot be predicted. Accordingly, if the Debtor's estate was in fact liquidated, the actual liquidation proceeds could be materially lower or higher than the amounts set forth below and no representation or warranty

can be or is being made with respect to the actual proceeds that could be received in a Chapter 7 liquidation.

## XIV.  SUMMARY, RECOMMENDATION, AND CONCLUSION

The Plan provides for an orderly and prompt Distribution to Holders of Allowed Claims and the satisfaction of all asserted Claims and Interests.  In the opinion of the Debtor, the Plan provides for a larger Distribution to the Debtor's Creditors than would otherwise result in liquidation under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller Distributions to Holders of Allowed Claims than proposed under the Plan.

***Accordingly, the Debtor recommends that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan***.

Dated: August 12, 2011

                                        CARGO TRANSPORTATION SERVICES, INC.


                                        By:   */s/ David Bell*_____
                                              David Bell, President and COO